**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| *In re: NCB Management Services, Inc. Data Breach Litigation* | **CIVIL NO. 23-1236**<br><br>**This Document Applies To:**<br><br>**ALL ACTIONS**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Joseph Lindquist, Lillian Mardikian, Howard Suh, Ernesto Medina, Benedict Lozada, Edward Del Hierro, Kylie Meyer, Tobi Patterson, Jude-Law Palmer, Kevin Bliss, Michael Teixeira, Diane Ross, Jacqueline O'Brien, Kelly Matts, Micael Martin, and Timothy Beeker (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, assert the following against Defendants NCB Management Services, Inc. ("NCB"); Bank of America Corporation ("BOA"); and Pathward, N.A. f/k/a Metabank, N.A. ("Pathward"); John Does 1-10 (collectively, together "Defendants"),[1] based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

**INTRODUCTION**

1.     NCB is a national debt collection and accounts receivable management company based in Trevose, Pennsylvania. It provides account services to companies, such as BOA and Pathward, among other financial institutions and lenders.

2.     During the course of its operations, each of the Defendants acquired, collected, stored, utilized, and derived a benefit from Plaintiffs' and Class Members' first and last names,

---

[1] BOA and Pathward will be collectively referred to as the "Bank Defendants."

addresses, phone numbers, email addresses, dates of birth, employment positions, pay amounts, driver's license numbers, Social Security numbers, account numbers, credit card numbers, routing numbers, account balances, and/or account statuses (collectively the "Personally Identifiable Information" or "PII").

3.      Defendants, therefore, each owed and otherwise assumed non-delegable statutory, regulatory, contractual, and common law duties and obligations, including to keep Plaintiffs' and Class Members' PII confidential, safe, secure, and protected from the type of unauthorized access, disclosure, and theft that occurred in this matter.

4.      Defendants' data security obligations and risks of storing sensitive PII in a vulnerable state, were upon information and belief known and recognized by Defendants given the public and financial industry awareness in high frequency of targeted data breaches.  Indeed, during the course if its business operations, Defendants expressly and impliedly promised to safeguard Plaintiffs' and Class Members' PII.

5.      Furthermore, Plaintiffs and Class Members each provided their PII to Defendants with a reasonable expectation of privacy that Defendants would comply with their respective duties, obligations, and representations, and that their PII would be adequately safeguarded and protected against unauthorized access, disclosure and exfiltration.

6.      Despite notice of the risk of a data breach, Defendants each breached their respective duties to Plaintiffs and Class Members as described in detail herein.

7.      On February 4, 2023, NCB discovered that an unauthorized third party gained access to its systems on February 1, 2023, that stored Plaintiffs' and Class Members' highly

sensitive information (the "Data Breach"). NCB first publicly announced the Data Breach on or around March 24, 2023.[2]

8.      However, the Data Breach was much larger than NCB initially disclosed and was in fact a part of a companywide ransomware attack affecting NCB's systems and servers. On or around May 23, 2023, NCB issued an additional public announcement that the number of people affected by the Data Breach was approximately 1,087,842 – more than double the initial estimate.[3] NCB followed up with additional public announcements. However, the full extent of the Data Breach is not yet known.

9.      Given the type of business in which Defendants operated and the types of PII routinely acquired and stored, the Data Breach was significantly impactful and dangerous to the impacted consumers.

10.      Indeed, several Plaintiffs have already experienced identity theft or fraud that, likely, is likely attributable to the Data Breach.

11.      Currently, the full extent of the types of sensitive PII, the scope of the Data Breach, and the root cause of the Data Breach are all within the exclusive control of Defendants and their agents, counsel, and forensic security vendors at this phase of litigation.

12.      Upon information and belief, Defendants are responsible for allowing this Data Breach because of multiple acts of negligence, including but not limited to: (i) their failure to design, implement, and maintain reasonable data security systems and safeguards; (ii) and/or

---

[2] According to NCB, "confidential client account information maintained by NCB was accessed by an unauthorized party." At the time, NCB indicated that the Data Breach impacted 494,969 people. *See* Office of the Maine Attorney General, Data Breach Notifications, NCB Management Services, Inc., Mar. 24, 2023, *available at* https://apps.web.maine.gov/online/aeviewer/ME/40/65d544dc-79b0-437c-a7f8-757ffec624af.shtml (last visited July 20, 2023).

[3] *See* Office of the Maine Attorney General, Data Breach Notifications, NCB Management Services, Inc., May 19, 2023, *available at* https://apps.web.maine.gov/online/aeviewer/ME/40/fcafcce5-ef56-4784-a86a-820c6b1aa127.shtml (last visited July 20, 2023).

failure to exercise reasonable care in the hiring, supervision, training, and monitoring of its employees and agents and vendors; (iii) and/or failure to comply with industry-standard data security practices; (iv) and/or failure to comply with federal and state laws and regulations that govern data security and privacy practices and are intended to protect the type of PII at issue in this action; (v) and/or failure to design, implement and execute reasonable data retention and destruction policies.

13.     Upon information and belief, despite its role in managing so much sensitive PII, NCB failed to take basic security measures such as adequately encrypting its data or following industry security standards to destroy PII that was no longer necessary for the intended business purpose.

14.     Moreover, NCB failed to recognize and detect that unauthorized third parties had accessed its network in a timely manner to mitigate the harm. NCB further failed to recognize that substantial amounts of data had been compromised, and more likely than not, had been exfiltrated and stolen. Had NCB not committed the acts of negligence described herein, it would have discovered the Data Breach sooner – and/or prevented the invasion and theft altogether.

15.     Upon information and belief, based on the type of sophisticated and malicious criminal activity, the type of PII targeted, NCB's admission that the PII was accessed, NCB's admission that Plaintiffs' and Class Member's PII was in the files that were accessed, and reports of criminal misuse of Plaintiffs' and Class Members' PII, Plaintiffs' and Class Members' PII was likely accessed, disclosed, exfiltrated, stolen, disseminated, and used by a criminal third party.

16.     Moreover, as a result of the Data Breach, given the criminal targeting of the PII, the sensitivity of the information, the likelihood of exfiltration, and reports of actual fraud following the Data Breach, Plaintiffs and Class Members are now experiencing a current,

imminent, and ongoing risk of fraud and identity theft. The risk of identity theft is not speculative or hypothetical but is impending and has materialized.

17.    Plaintiffs have suffered several categories of related and actual harm: (i) invasion of privacy, (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud and/or unauthorized use of their PII, (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, (iv) lost or diminished value of PII, (v) loss of benefit of the bargain, (vi) future costs of ongoing credit and identity theft monitoring, (vii) statutory damages, (viii), nominal damages, (ix) and the ongoing future risk of harm as long as Defendants maintains Plaintiffs and Class Members PII with inadequate security practices.

18.    Plaintiffs and Class Members would not have provided their PII, engaged in a consumer relationship, or paid any banking, debt collection, servicing, transactional or other fees for Defendants' services, had they known their information would be maintained using inadequate data security and retention systems.

19.    In this era of frequent data security attacks and data breaches, particularly in the financial industry, Defendants' failures leading to the Data Breach are particularly egregious, as this Data Breach was highly foreseeable.

20.    Plaintiffs, on behalf of themselves, and all others similarly situated, bring claims for negligence, negligence *per se*, breach of implied contract, unjust enrichment, violations of state consumer protection and data privacy statutes, the Driver's Privacy Protection Act ("DPPA"), declaratory and injunctive relief, and breach of contract to which Plaintiffs and Class Members were intended third party beneficiaries.

21.     Plaintiffs seek actual, compensatory, consequential, incidental, punitive, nominal and statutory damages, in an amount to be proven at trial. Plaintiff also seek future compensatory damage to provide adequate credit and identity theft monitoring. And Plaintiffs seek declaratory and injunctive relief related to the ongoing and future risk of identity theft requiring Defendants to adopt reasonably sufficient practices to safeguard the PII that remains in Defendants' custody and control in order to prevent incidents like the Data Breach from reoccurring in the future.

## JURISDICTION AND VENUE

22.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as it arises under the laws of the United States, including the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721, *et seq.*

23.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1332(d), because the amount in controversy for the Class exceeds $5,000,000, exclusive of interest and costs, there are more than 100 putative Members of the Class defined below, and a significant portion of putative Class Members are citizens of a different state than Defendants.

24.     The Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because they are related to claims in the action within such original jurisdiction, and they form part of the same case or controversy under Article III of the United States Constitution.

25.     This Court has general personal jurisdiction over Defendant NCB because NCB is incorporated in the Commonwealth of Pennsylvania and maintains its principal place of business in this District.

26.    This Court has general personal jurisdiction over Defendant BOA, as BOA is registered to do business in the Commonwealth of Pennsylvania with the Pennsylvania Department of State.

27.    This Court has specific personal jurisdiction over Defendant Pathward because Pathward has sufficient contacts in this jurisdiction, the matter is related to those contacts, and the forum does not offend traditional notions of fair play or substantial justice. Pathward purposefully availed itself of the forum by, among other things, issuing credit cards, loans, or marketing its services and products in the Commonwealth of Pennsylvania, and this conduct, including engaging in relationship with NCB in this District, which gives rise to Plaintiffs' claims. It was foreseeable that such contacts, contracts, and business operations involving the sharing of data with a Bucks County, Pennsylvania based company would result in litigation in this District Court. Furthermore, Pennsylvania's long-arm statute provides for jurisdiction to the fullest extent allowed under the Constitution of the United States based on the most minimum contact with the Commonwealth allowed under the Constitution of the United States. *See* 42 Pa. Stat. and Cons. Stat. Ann. § 5322(a)-(b).

28.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Trevose, Pennsylvania is the principal place of business operations for NCB where policies and decisions were made related to the data security systems and management at issue in this matter.

## PARTIES

### I.     Plaintiffs

#### *Plaintiff Joseph Lindquist*

29.     Plaintiff Joseph Lindquist ("Plaintiff Lindquist") is a citizen and resident of the State of Florida. Plaintiff Lindquist was a customer of BOA prior to the Data Breach.

#### *Plaintiff Lillian Mardikian*

30.     Plaintiff Lillian Mardikian ("Plaintiff Mardikian") is a citizen and resident of the State of California. Plaintiff Mardikian was a customer of BOA prior to the Data Breach.

#### *Plaintiff Howard Suh*

31.     Plaintiff Howard Suh ("Plaintiff Suh") is a citizen and resident of the State of California. Plaintiff Suh was a customer of BOA prior to the Data Breach.

#### *Plaintiff Ernesto Medina*

32.     Plaintiff Ernesto Medina ("Plaintiff Medina") is a citizen and resident of the State of California. Plaintiff Medina was a customer of BOA prior to the Data Breach.

#### *Plaintiff Benedict Lozada*

33.     Plaintiff Benedict Lozada ("Plaintiff Lozada") is a citizen and resident of the State of California. Plaintiff Lozada received the May 22, 2023 Data Breach Notification Letter which purports to be for Pathward.

#### *Plaintiff Edward Del Hierro*

34.     Plaintiff Edward Del Hierro ("Plaintiff Del Hierro") is a citizen and resident of the State of California. Plaintiff Del Hierro received the May 23, 2023 Data Breach Notification Letter which purports to be for Pathward.

*Plaintiff Kylie Meyer*

35.     Plaintiff Kylie Meyer ("Plaintiff Meyer") is a citizen and resident of the State of New York.  Plaintiff Meyer was a customer of BOA prior to the Data Breach.

*Plaintiff Tobi Patterson*

36.     Plaintiff Tobi Patterson ("Plaintiff Patterson") is a citizen and resident of the State of Texas. Plaintiff Patterson was a customer of BOA prior to the Data Breach.

*Plaintiff Jude-Law Palmer*

37.     Plaintiff Jude-Law Palmer ("Plaintiff Palmer") is a citizen and resident of the State of Georgia. Plaintiff Palmer was a customer of BOA prior to the Data Breach.

*Plaintiff Kevin Bliss*

38.     Plaintiff Kevin Bliss ("Plaintiff Bliss") is a citizen and resident of the Commonwealth of Massachusetts. Plaintiff Bliss was a customer of BOA prior to the Data Breach.

*Plaintiff Michael Teixeira*

39.     Plaintiff Michael Teixeira ("Plaintiff Teixeira") is a citizen and resident of the Commonwealth of Massachusetts. Plaintiff Teixeira was a customer of BOA prior to the Data Breach.

*Plaintiff Diane Ross*

40.     Plaintiff Diane Ross ("Plaintiff Ross") is a citizen and resident of the State of California. Plaintiff Ross received the May 23, 2023 Data Breach Notification Letter which purports to be for Pathward.

***Plaintiff Jacqueline O'Brien***

41.     Plaintiff Jacqueline O'Brien ("Plaintiff O'Brien") is a citizen and resident of the State of California. Plaintiff O'Brien received the May 23, 2023 Data Breach Notification Letter which purports to be for Pathward.

***Plaintiff Kelly Matts***

42.     Plaintiff Kelly Matts ("Plaintiff Matts") is a citizen and resident of the State of California. Plaintiff Matts received the May 23, 2023 Data Breach Notification Letter which purports to be for Pathward.

***Plaintiff Micael Martin***

43.     Plaintiff Micael Martin ("Plaintiff Martin") is a citizen and resident of the State of California. Plaintiff Martin received the May 23, 2023 Data Breach Notification Letter which purports to be for Pathward.

***Plaintiff Timothy Beeker***

44.     Plaintiff Timothy Beeker ("Plaintiff Beeker") is a citizen and resident of the State of Oregon. Plaintiff Beeker was a customer of Bank of America prior to the Data Breach.

**II.     Defendants**

***NCB***

45.     Defendant NCB is a domestic Pennsylvania corporation with its headquarters and principal place of business located at 1 Allied Drive, Trevose, Pennsylvania.

46.     Founded in 1994, Defendant NCB is a national debt buyer, debt collector, and provider of Accounts Receivable Management ("ARM") and Call Center Management ("CCM") solutions for financial institutions and lenders, including Defendants BOA and Pathward.

10

*Bank of America*

47.     Defendant BOA is a Delaware corporation. BOA is registered with the Pennsylvania Department of State to do business in the Commonwealth of Pennsylvania. BOA provides banking and credit products to consumers. BOA's principal place of business and headquarters is located at 100 North Tryon Street, Charlotte, North Carolina 28255.

*Pathward*

48.     Defendant Pathward is registered as a national bank and is regulated by the Office of the Comptroller of the Currency. Pathward provides banking and credit products to consumers. Defendant Pathward's principal place of business and headquarters is located at 5501 South Broadband Lane, Sioux Falls, South Dakota 57108.

*John Does 1-10*

49.     Defendants John Does-10 refers to those not yet known financial institution Defendants who, similar to BOA and Pathward, were NCB clients and had their customers' PII accessed and compromised as part of the Data Breach. Plaintiffs believe the full extent of the Data Breach, including those effected institutions will be unearthed through discovery.

## <u>ALLEGATIONS</u>

**I.    The Data Breach**

50.      NCB has provided very little information about the full scope and causes of the Data Breach, which purports to be a *ransomware* cyber-attack on the company's network.

51.     According to the U.S. Cybersecurity and Infrastructure Security Agency ("CISA"):

> Ransomware is an ever-evolving form of malware designed to encrypt files on a device, rendering any files and the systems that rely on them unusable. Malicious actors then demand ransom in exchange for decryption. Ransomware actors often target and threaten to sell or leak exfiltrated data or authentication information if the ransom is not paid. … Malicious actors continue to adjust their

ransomware tactics over time, to include pressuring victims for payment by threatening to release stolen data if they refuse to pay, and publicly naming and shaming victims as secondary forms of extortion. ***Malicious actors engage in lateral movement to target critical data and propagate ransomware across entire networks.*** These actors also increasingly use tactics, such as deleting system backups, that make restoration and recovery more difficult or infeasible for impacted organizations.[4]

(emphasis added).

52.     In a typical ransomware attack a hacker will deploy malware against a company's network that will encrypt a company's data and prevent access to the data until the ransom payment is paid and a decryption key is given, and the data is released. However, there is often no way to gauge the accuracy or truthfulness of any assurances that hackers might make, even if the ransom is paid. Ransomware attackers often use social engineering techniques, such as phishing, to gain access to a company's environment.

53.     According to CISA, ransomware incidents "can severely impact business processes and leave organizations without the data they need to operate and deliver mission-critical services."[5]

54.     The monetary value of ransom demands has increased, with some demands exceeding $1 million. Ransomware incidents have become more destructive and impactful in nature and scope. The economic and reputational impacts of ransomware incidents, throughout the initial disruption and, at times, extended recovery, have also proven challenging for organizations large and small."

55.     On or around March 24, 2023, NCB publicly announced that confidential client account information maintained by NCB was accessed by an unauthorized party.

---

[4] CISA, *Ransomware 101*, *available at* https://www.cisa.gov/stopransomware/ransomware-101 (last visited July 20, 2023).
[5] *Id.*

56.     NCB via BOA began notifying only certain persons affected by the Data Breach via U.S. mail on or around March 24, 2023.[6]

57.     According to the BOA Data Breach Notification Letter, NCB discovered on February 4, 2023, that an unauthorized party gained access to NCB's systems on February 1, 2023.[7] NCB confirmed on March 8, 2023, that client information previously connected with affected persons' BOA accounts were accessed by the unauthorized party.[8]

58.     According to the BOA Data Breach Notification Letter, "[t]he unauthorized activity on NCB's systems has been stopped, and NCB has obtained *assurances* that the third party no longer has any of the information on its systems."[9] (emphasis added).

59.     Based on NCB's own admission in the notice letter, NCB alludes to the fact that the Data Breach was the result of a ransomware type of cyber-attack, and that NCB at least communicated with the cyber criminals to receive those purported "assurances." It is unclear if NCB actually paid any ransom (and if so how much?) to the hackers and what "assurances" were given.

60.     According to a recent March 21, 2023 article in *Bloomberg* entitled "Banks, Financial Industry Hit by Rising Ransomware Attacks," the Financial Services Information Sharing and Analysis Center's ("FS-ISAC") annual outlook on cyber threats in the financial services industry found that "ransomware remained the biggest concern," as the "increase in

---

[6] According to the Data Breach notification posting on the Maine Attorney General's website, it was BOA - *not* NCB - who notified the Maine Attorney General of NCB's Data Breach and sent the data breach notification letters to affected persons. The Maine Attorney General's website says the Data Breach notification was submitted to the state by "WilmerHale LLP" who is listed as "Outside counsel for Bank of America." However, the letter was signed by NCB. A sample letter to affected consumers of the NCB Data Breach is included on the Maine Attorney General's website. *See Data Breach Notifications*, Office of the Maine Att'y Gen., *available at* https://apps.web.maine.gov/online/aeviewer/ME/40/65d544dc-79b0-437c-a7f8-757ffec624af/d7667acf-0b40-44c3-a168-5efbdd973ca0/document.html (last visited July 20, 2023) (the "BOA Data Breach Notification Letter").
[7] *Id.*
[8] *Id.*
[9] *Id.*

attacks was likely due to the proliferation of the ransomware-as-a-service model, in which hacking groups provide 'affiliates' with the malware and services necessary to carry out an attack, in exchange for a share of the criminal proceeds."[10] FS-ISAC cited "business email compromise" in which criminals send an email that appears to come from a known source making a legitimate request — as a major issue for the financial services sector, with members reporting a 300% increase from 2021 to 2022.[11]

61.    According to UK security firm Sophos, cyber attackers on average have 11 days after breaching a target network before they're being detected and often when they are spotted it's because they've deployed ransomware. Sophos found that this was more than enough time for an attacker to get a thorough overview of what a target network looks like, where its weaknesses lie, and for ransomware attackers to wreck it.[12]

62.    To put that timeframe into context, according to Sophos, "11 days potentially provide attackers with approximately 264 hours for malicious activity, such as lateral movement, reconnaissance, credential dumping, data exfiltration, and more. Considering that some of these activities can take just minutes or a few hours to implement, 11 days provide attackers with plenty of time to do damage."[13]

63.    According to NCB's BOA Data Breach Notification Letter, the PII involved for BOA customers included first and last names, addresses, phone numbers, email addresses, dates of birth, employment positions, pay amounts, driver's license numbers, Social Security numbers,

---

[10] Andrew Martin, BLOOMBERG, *Banks, Financial Industry Buffeted by Rising Ransomware Attacks*, Mar. 21, 2023, *available at* https://www.bloomberglaw.com/bloomberglawnews/privacy-and-data-security/XAJON3U0000000?bna_news_filter=privacy-and-data-security#jcite (last visited July 20, 2023).
[11] *Id.*
[12] *See* Liam Tung, ZDNET, *This is how long hackers will hide in your network before deploying ransomware or being spotted*, May 19, 2021, *available at* https://www.zdnet.com/article/this-is-how-long-hackers-will-spend-in-your-network-before-deploying-ransomware-or-being-spotted/ (last visited July 20, 2023).
[13] *Id.*

account numbers, credit card numbers, routing numbers, account balances, and/or account statuses.[14]

64.    As noted above, the Data Breach was much larger and more extensive than what NCB initially disclosed on March 24, 2023. In the coming weeks, it was disclosed that in addition to BOA, three additional financial institutions (TDBank, Capital One, and Pathward) who were NCB clients, had their customers' PII accessed as part of the Data Breach.

65.    To date, NCB has not revealed the full list of effected financial institutions who had their customers' PII accessed as part of the Data Breach. As described below, NCB has been particularly ambiguous with identifying those institutions to regulators and the public.

66.    Supplemental notice letters went out by U.S. mail to additional affected individuals who were Pathward customers.

67.    On May 22, 2023, NCB's outside counsel contacted the Maine Attorney General to notify the state that an additional NCB client, Pathward, had their customer information compromised as part of the Data Breach.[15] NCB's letter to the Maine Attorney General however only identified "[t]he NCB clients who have elected to be identified in this notification," which apparently was just Pathward.[16]

68.    NCB was further ambiguous in identifying its "clients" when it stated that "NCB is providing notice on behalf of its business partners, including, *but not limited to*, [Pathward]."[17] (emphasis added). The Pathward Data Breach Notification Letter that was sent to affected

---

[14] *See* BOA Data Breach Notification Letter.
[15] *See Data Breach Notifications*, Office of the Maine Att'y Gen., *available at* https://apps.web.maine.gov/online/aeviewer/ME/40/fcafcce5-ef56-4784-a86a-820c6b1aa127/36165108-5d54-4071-81cc-7ec0746e6a40/document.html (last visited July 20, 2023) (the "Pathward Data Breach Notification Letter").
[16] *Id.*
[17] *Id.*

individuals purportedly came from NCB as it was on NCB letterhead (unlike the BOA Letter) and signed by NCB.[18]

69.    The Pathward Data Breach Notification Letter informed affected individuals that "confidential client account information maintained by NCB was accessed by an unauthorized party."[19] According to NCB's Pathward notice letter, the information accessed related to first and last name and Social Security numbers.[20] The Pathward Data Breach Notification Letter also stated that NCB only just "confirmed" on April 19, 2023, that customers' information was accessed, weeks after BOA customers were notified in March.[21]

**II.    Defendants Obtain, Collect, and Store Plaintiffs' and Class Members' PII**

70.    In the ordinary course of doing business as a national debt collector and accounts receivable management company that provides account services to companies, such as BOA and Pathward, NCB regularly obtains, collects, and stores sensitive, personal, and private protected information, such as the PII involved here.

71.    Financial institutions and lenders, such as BOA and Pathward, hired NCB to service, manage, and collect outstanding and overdue balances on their customer accounts. In turn they provide their customers' PII, including the PII of Plaintiffs and Class Members, to NCB.

72.    NCB maintains, keeps, and exploits Plaintiffs' and Class Members' PII for NCB's own benefit, including long after individuals have paid off their accounts in full. Upon information and belief, NCB keeps and stores this legacy information on its systems in an unsecure manner.

73.    NCB is in complete operation, control, and supervision of its servers and systems.

---

[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*

74. NCB intentionally configured and designed its servers and systems in such a way that allowed it to be susceptible to cyber-attack. Further, NCB intentionally configured and designed its servers and systems without adequate data security protections and without regard to Plaintiffs' and Class Members' PII, which was disclosed to cyber criminals.

75. BOA and Pathward entrusted NCB with their customers' PII. Further, these financial institutions did not properly verify, oversee, and supervise NCB's entrustment of their customers' PII.

76. By obtaining, using, disclosing, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

77. Plaintiffs and Class Members reasonably expect that financial institutions and their vendors, such as Defendants, will use the utmost care to keep their PII confidential and securely maintained, to use this information for business purposes only, to only store it until it is no longer needed, to properly dispose of it, and to make only authorized disclosures of this information.

78. Defendants failed to prioritize data and cyber security by adopting reasonable data and cyber security measures to prevent and detect the unauthorized access to Plaintiffs' and Class Members' PII.

79. Had Defendants remedied the security deficiencies, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendants would have prevented the theft of Plaintiffs' and Class Members' confidential PII.

80. Given the rise in ransomware attacks in the financial services industry, NCB was a prime target in this Data Breach.

81. As noted, the Data Breach appears to be a ransomware attack. While NCB claims that it "discovered on February 4 that an unauthorized party gained access to NCB's systems on February 1, 2023," given what is known about ransomware attacks, how long hackers typically lie hidden in a company's systems before being discovered, how hackers propagate ransomware across entire networks, as well as the scope of the PII involved in this Data Breach—the hackers were likely in NCB's systems and servers well before February 1, with unfettered access to Plaintiffs' and Class Members' PII.

### III.    Defendants' Data Security Failures

82. By its own admission, NCB "blend[s] many years of ARM experience with the *latest in new information systems* and communication technology."[22] (emphasis added). However, NCB's words ring hollow. As described *infra*, NCB's emphasis on proper data security in its "information systems" was woefully lacking and far from "new."

83. Prevention is the most effective defense against ransomware and it is critical to take precautions for protection. However, NCB took no such precautions to appropriately secure Plaintiffs' and Class Members' PII.

84. Further, NCB's data retention practices were also severely deficient. NCB continued to store and maintain PII for many many years after NCB had appropriate use for such data. BOA and Pathward also failed to properly supervise NCB's data retention practices to ensure that customer data that was no longer needed was properly archived and/or removed from NCB's servers and systems.

85. NCB failed to archive such PII and remove it from its servers and systems, which allowed hackers to gain access to the PII in the Data Breach.

---

[22] NCB, *NCB Management Services, Inc. Partners with Interactions to Power Consumer-Centric Conversations*, Jan. 27, 2022, *available at* https://ncbi.com/NewsArticles/jan272022 (last visited July 20, 2023).

18

86.    Up to and including the period when the Data Breach occurred, Defendants breached their duties, obligations, and promises to Plaintiffs and Class Members by their failure to:

a.   hire qualified personnel and maintain a system of accountability over data security, thereby knowingly allowing data security deficiencies to persist;

b.   properly supervise and train its employees, and ensure that their vendor's employees were supervised and trained, about the risk of cyber-attacks and how to mitigate them, including by failing to implement adequate security awareness training that would have instructed employees about the risks of common techniques, what to do if they suspect such attacks, and how to prevent them;

c.   address well-known warnings that its systems and servers, and those of its vendors, were susceptible to a data breach;

d.   implement certain protocols that would have prevented unauthorized programs, such as malware and ransomware, from being installed on its servers and systems that accessed customers' personal information and otherwise would have protected customers' sensitive personal information;

e.   install software to adequately track access to its network, monitor the network for unusual activity, and prevent exfiltration of data, which would have detected the presence of hackers and prevented customers' sensitive personal information from being stolen. Specifically, there are recommended, available measures to prevent data from leaving protected systems and being sent to untrusted networks outside of the corporate systems; and

f. adequately safeguard customers' sensitive personal information and maintain an adequate data security environment to reduce the risk of a data breach or unauthorized disclosure.

87. Up to, and including, the period when the Data Breach occurred, Defendants breached their duties, obligations, and promises to Plaintiffs and Class Members by their failure to oversee the entrustment of Plaintiffs' and Class Members' PII.

**IV.    NCB's Failure to Comply with Government and Industry Guidelines, Standards, and Recommendations**

88. According to NCB, "[a]chieving superior results and protecting [its clients'] reputation are NCB's highest priorities."[23] NCB says it "accomplishes" this by using "the latest technology advancements," "***apply[ing] the highest in security standards***" and "employ[ing] a well-trained, highly effective staff."[24] (emphasis added).

89. However, NCB fell woefully short not only in its own self-professed "security standards," but also industry standards as well.

90. Hackers routinely target financial services providers and vendors, such as NCB, since they are particularly vulnerable to cyber-attacks because of the value of the PII which they collect and maintain.

91. Industry experts identify several best practices that, at a minimum, should be implemented by ARM companies such as NCB, including but not limited to: educating all employees, strong passwords, multi-layer security, including firewalls, anti-virus, and antimalware software, encryption, making data unreadable without a key, multi-factor authentication, backup data, and limiting which employees can access sensitive data.

---

[23] NCB, *Financial Recovery*, *available at* https://www.ncbi.com/Financial (last visited July 20, 2023).
[24] *Id.*

92.    Upon information and belief, NCB failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls ("CIS CSC"), which are all established standards in reasonable cybersecurity readiness.

93.    CISA recommends the following precautions to organizations to protect them against the threat of ransomware:

- Update software and operating systems with the latest patches. Outdated applications and operating systems are the target of most attacks.

- Never click on links or open attachments in unsolicited emails.

- Back up data on a regular basis. Keep it on a separate device and store it offline.

- Follow safe practices when using devices that connect to the Internet. Read "Good Security Habits" for additional details.[25]

94.    In addition, the U.S. Government also recommends that organizations employ the following best practices when it comes to ransomware:

- Restrict users' permissions to install and run software applications, and apply the principle of "least privilege" to all systems and services. Restricting these privileges may prevent malware from running or limit its capability to spread through a network.

- Use application allow listing to allow only approved programs to run on a network.

---

[25] CISA, *Ransomware FAQs*, *available at* https://www.cisa.gov/stopransomware/ransomware-faqs (last visited July 20, 2023).

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

95.    Upon information and belief, NCB failed to meet CISA and the federal government's above data security recommendations concerning ransomware. This failure resulted in the Data Breach.

96.    The above government and industry frameworks are existing and applicable industry standards in the financial services industry. Upon information and belief, NCB failed to comply with these accepted standards, and BOA and Pathward, failed to ensure NCB's compliance with these standards, which left NCB susceptible to the Data Breach.

97.    At all times, NCB was in complete control of the configuration and design of its servers and systems.

**V.    Defendants' Data Security Failures Constitute Unfair and Deceptive Practices and Violations of Consumers' Privacy Rights**

98.    Defendants are prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The U.S. Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for sensitive personal information is an "unfair practice" in violation of the FTC Act.

99.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

100.    In 2007, the FTC published guidelines that establish reasonable data security practices for businesses. The guidelines note that businesses should protect the personal information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommend that businesses consider using an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone may be trying to hack the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

101.    The FTC has also published a document entitled "FTC Facts for Business," which highlights the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

102.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to private data, require complex passwords to be used on networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

103.    The FTC has also brought enforcement actions against businesses for failing to adequately and reasonably protect personal data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to sensitive personal information as an unfair act or practice prohibited by Section 5 of the FTC Act. The FTC has issued orders against businesses that have failed to employ reasonable measures to secure sensitive personal

information. These orders provide further guidance to businesses regarding their data security obligations.

104.    The FTC deems the failure to employ reasonable and appropriate measures to protect against unauthorized access to sensitive personal information an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

105.    Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to PII or to prevent the disclosure of such information to unauthorized individuals, as reflected by the sensitive driver's license numbers and Social Security numbers stolen, constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

106.    NCB was always fully aware of its obligations to protect PII since it was in the business as an ARM of obtaining, collecting, and disclosing PII as well as collecting, storing, and using other confidential personal and financial information and BOA and Pathward were also aware of their obligations to protect their customers' PII and to ensure compliance by their vendors. Defendants were also aware of the significant repercussions that would result from its failure to do so.

107.    Prior to and during the Data Breach, Defendants failed to follow guidelines set forth by the FTC and actively mishandled the management of their IT security.

108.    Furthermore, by failing to have reasonable data security measures in place, Defendants engaged in an unfair act or practice within the meaning of Section 5 of the FTC Act.

## VI.     Bank Defendants and John Doe 1-10 Defendants Failed to Comply with Gramm-Leach-Bliley Act ("GLBA")

109.     The Bank Defendants and John Doe 1-10 Defendants are financial institutions, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and are thus subject to the GLBA.

110.     The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [the Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

111.     The Bank Defendants and John Doe 1-10 Defendants collect nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period the Bank Defendants and John Doe 1-10 Defendants were subject to the requirements of the GLBA, 15 U.S.C. § 6801.1, *et seq.*, and are subject to numerous rules and regulations promulgated on the GLBA statutes.

112.     The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. § 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

113.     Accordingly, the Bank Defendants' and John Doe 1-10 Defendants' conduct is governed by the Privacy Rule prior to December 30, 2011, and by Regulation P after that date.

114.     Both the Privacy Rule and Regulation P require financial institutions to provide customers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous." 16 C.F.R. §§ 313.4(a) and 313.5(a)(1); 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and

conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1).

115.    These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4(a)(1) and 313.5(a)(1); 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9(a); 12 C.F.R. § 1016.9.

116.    As alleged herein, the Bank Defendants and John Doe 1-10 Defendants violated the Privacy Rule and Regulation P.

117.    Upon information and belief, the Bank Defendants and John Doe 1-10 Defendants failed to provide annual privacy notices to customers after the customer relationship ended, despite retaining these customers' PII and storing and/or sharing that PII on its network.

118.    The Bank Defendants and John Doe 1-10 Defendants failed to adequately inform its customers that it was storing and/or sharing, or would store and/or share, the customers' PII on its inadequately secured network and would do so after the customer relationship ended.

119.    The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (a) designating

one or more employees to coordinate the information security program; (b) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (c) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (d) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (e) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances.  16 C.F.R. §§ 314.3 and 314.4.

120.    As alleged herein, the Bank Defendants and John Doe 1-10 Defendants violated the Safeguard Rule.

121.    The Bank Defendants and John Doe 1-10 Defendants failed to assess reasonably foreseeable risks to its networks, and the security, confidentiality, and integrity of PII in its custody or control. The Bank Defendants and John Doe 1-10 Defendants failed to design and implement information safeguards to control the risks identified through risk assessment, and regularly test or otherwise monitor the effectiveness of the safeguards' key controls, systems, and procedures.

122.    The Bank Defendants and John Doe 1-10 Defendants failed to adequately oversee service providers, such as NCB.

123.    The Bank Defendants and John Doe 1-10 Defendants failed to evaluate and adjust their information security programs in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances.

## VII.    The Value of the Disclosed PII and Effects of Unauthorized Disclosure

124.    Defendants understood that the protected PII it transfers, acquires, stores, and utilizes is highly sensitive and of significant value to the owners of the PII and those who would use it for wrongful purposes.

125.    PII is a valuable commodity to identity thieves, particularly when it is aggregated in large numbers. Former United States Attorney General William P. Barr made clear that consumers' sensitive personal information commonly stolen in data breaches "has economic value."[26]

126.    The purpose of stealing large caches of personal data is to use it to defraud individuals or to place it for illegal sale and profit from other criminals who buy the data and use it to commit fraud and identity theft. Indeed, cybercriminals routinely post stolen personal information on anonymous websites, making the information widely available to the criminal underworld.

127.    There is an active and robust market for this information. As John Sancenito, President of Information Network Associates, a company which helps companies with recovery after data breaches, explained after a data breach "[m]ost of the time what [data breach hackers] do is they steal the data and then they sell the data on the dark web to the people who actually commit the fraud."[27]

128.    Some of the forms of PII involved in this Data Breach are particularly concerning. Unique Social Security and driver's license numbers cannot be easily replaced. Even when such

---

[26] William P. Barr, U.S. DEPT. OF JUSTICE, *Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, Feb. 10, 2020, *available at* https://www.justice.gov/opa/speech/attorney-general-william-p-barr-announces-indictment-four-members-china-s-military (last visited July 20, 2023).

[27] Priscilla Liguori, ABC27 (WHTM), *Legislator, security expert weigh in on Rutter's data breach*, Feb. 14, 2020 (updated: Feb. 17, 2020), *available at* https://www.abc27.com/local-news/york/legislator-security-expert-weigh-in-on-rutters-data-breach/ (last visited July 20, 2023).

numbers are replaced, the process of doing so results in a major inconvenience to the affected person, requiring a wholesale review of their relationships with government agencies and any number of private companies, in order to update the person's accounts with those entities.

129.    ***Driver's license numbers***—which were compromised as a result of the Data Breach—are highly sought after by cybercriminals on the dark web because they are unique to a specific individual, extremely sensitive, and cannot easily be replaced.

130.    Experian, a globally recognized credit reporting agency, has explained "[n]ext to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves."[28] This is because a driver's license number is connected to an individual's vehicle registration, insurance policies, records on file with the state Department of motor vehicles, and other government agencies, financial institutions, places of employment, doctor's offices, and other entities.

131.    For these reasons, driver's license numbers are highly sought out by cyber criminals because they are one of the most valuable pieces of information to facilitate identity theft and fraud. This information is valuable because cyber criminals can use this information to open credit card accounts, obtain insurance policies and submit fraudulent claims, open cell phone contracts, file fraudulent tax returns, file unemployment applications, as well as obtain bank loans under a person's name.

132.    ***Social Security numbers***—which were also compromised as a result of the Data Breach—are highly sought after by cyber criminals on the dark web because they are unique to a specific individual and extremely sensitive and cannot easily be replaced.

---

[28] Sue Poremba, EXPERIAN, *What Should I Do if My Driver's License Number is Stolen*, Oct. 24, 2018, *available at* https://web.archive.org/web/20191018195031/https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/ (last visited July 20, 2023).

133.    Indeed, even the Social Security Administration ("SSA") warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make it more difficult for you to get credit.[29]

134.    Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often, Social Security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes Social Security numbers a prime target for cyber criminals and a particularly attractive form of PII to steal and then sell.

135.    The ramifications of Defendants' failure to keep Plaintiffs' and Class Members' PII secure are long lasting and severe. To avoid detection, identity thieves often hold stolen data for months or years before using it. Also, the sale of stolen information on the "dark web" may take months or more to reach end-users, in part because the data is often sold in small batches as

---

[29] SSA, *Identity Theft and Your Social Security Number*, Publication No. 05-10064 July 2021, *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited July 20, 2023).

opposed to in bulk to a single buyer. Thus, Plaintiffs and Class Members must vigilantly monitor their financial accounts *ad infinitum*.

136.    In light of this reality, Defendants knew, or should have known, the importance of safeguarding the PII entrusted to it and the foreseeable consequences if its servers and systems were breached. However, NCB failed to take adequate cybersecurity measures to prevent the Data Breach from occurring.

137.    As highly sophisticated parties that handle sensitive PII, Defendants failed to establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of Plaintiffs' and other Class Members' PII to protect against anticipated threats of intrusion of such information.

138.    Identity thieves use stolen PII for various types of criminal activities, such as when personal and financial information is used to commit fraud or other crimes, including credit card fraud, phone or utilities fraud, bank fraud, and government fraud.

139.    The PII exfiltrated in the Data Breach can also be used to commit identity theft by placing Plaintiffs and Class Members at a higher risk of "phishing," "vishing," "smishing," and "pharming," which are other ways for cyber criminals to exploit information they already have in order to get even more personally identifying information from a person through unsolicited email, text messages, and telephone calls purportedly from a legitimate company requesting personal, financial, and/or login credentials.

140.    There is often a lag time between the occurrence of fraud and its discovery. Similarly, a gap in time often exists between when PII is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data
> may be held for up to a year or more before being used to commit

identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[30]

141. PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the cyber black market for years.

142. Plaintiffs and Class Members rightfully place a high value not only on their PII, but also on the privacy of that data.

143. Because of the Data Breach and the immense value of the PII that was stolen, Plaintiffs and Class Members face an increased risk of fraud and identity theft for many years into the future.

**VIII.    The Driver's Privacy Protection Act ("DPPA")**

144. NCB also had an obligation under the DPPA. The DPPA was enacted in 1994 in response to safety and privacy concerns stemming from the ready availability of personal information contained in state motor vehicle records. The DPPA was passed in the backdrop of the murder of actress Rebecca Schaeffer, whose murderer obtained her unlisted address through the California Department of Motor Vehicle ("DMV").

145. Additional concerns were raised when witnesses testified in hearings before Congress regarding the privacy of DMV information of domestic violence victims and law enforcement officers, among other safety concerns surrounding driver information. To address these concerns, the DPPA restricts the disclosure of personal information from motor vehicle records to certain permissible purposes expressly defined by the Act.

---

[30] GAO, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, June 2007, GAO-07-737, *available at* https://www.gao.gov/assets/a262904.html (last visited July 20, 2023).

146.     Unauthorized disclosures of information have long been seen as injurious. The common law alone will sometimes protect a person's right to prevent the dissemination of private information. Indeed, it has been said that privacy torts have become well-ensconced in the fabric of American law. And with privacy torts, improper dissemination of information can itself constitute a cognizable injury. Because damages for a violation of an individual's privacy are a quintessential example of damages that are uncertain and possibly unmeasurable, causes of action such as the DPPA provide privacy tort victims with a monetary award calculated without the need of proving actual damages.

147.     The DPPA states that "[a] [s]tate department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity: (1) personal information, as defined in 18 U.S.C. [§] 2725(3), about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section. . . ." 18 U.S.C. § 2721(a)(1).

148.     NCB had an obligation to use reasonable security measures under the DPPA, which further states that "[i]t shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title." 18 U.S.C. § 2722(a).

149.     Thus, the DPPA provides citizens with a private right of action in the event that their private information is knowingly obtained, disclosed, or used in a manner other than for the enumerated permissible purposes.

150.     The DPPA states: "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter [18 U.S.C.

§§ 2721, et seq.] shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court." 18 U.S.C. § 2724(a).

151.    The default rule under the DPPA is non-disclosure. The DPPA is structured such that 18 U.S.C. § 2721(a)(1) and 18 U.S.C. § 2722(a) provide the general prohibition on the release and use of motor vehicle information, and § 2721(b) enumerates fourteen specific exceptions to the general prohibition. Disclosing information to cyber criminals is not one of them. Because the PII was disclosed to unauthorized individuals—i.e., cyber criminals—there is no feasible argument that disclosure was "for a permissible purpose."

152.    If not for NCB's intentional configuration and design of its servers and systems, it would not have disclosed Plaintiffs' and Class Members' PII to cyber criminals.

153.    The Data Breach was a direct and proximate result of NCB's flawed configuration and design of its servers and systems and its failure to implement and follow even basic security procedures.

## COMMON INJURIES AND DAMAGES

154.    As result of Defendants' ineffective and inadequate data security practices, Plaintiffs and Class Members now face a present and ongoing risk of fraud and identity theft.

155.    Due to the Data Breach and the foreseeable consequences of PII ending up in the possession of cybercriminals, the risk of identity theft to Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy, (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft, (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk, (d) "out of pocket" costs incurred due to actual identity theft, (e) loss of time incurred due to actual identity

theft, (f) loss of time due to increased spam and targeted marketing emails, (g) the loss of benefit of the bargain, (h) diminution of value of their PII, and (i) the continued risk to their PII, which remains in Defendants' possession and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' PII.

### I.    The Risk of Identity Theft to Plaintiffs and Class Members Is Present and Ongoing

156.    The link between a data breach and the risk of identity theft is simple to grasp and well established: criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes, as discussed further below.

157.    Because a person's identity is akin to a puzzle with multiple data pieces, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity–or track the victim so as to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

158.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on victims.

159.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[31] Criminals, in particular, favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov but, on the dark web, the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[32] This anonymity prevents dark web marketplaces from being easily monitored by authorities or accessed by less sophisticated users.

160.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs and frequently, personal, and medical information like the PII at issue here.[33] The digital character of PII stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet while the buyer and seller retain their anonymity. The sale of a firearm or drugs, on the other hand, requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials and Social Security numbers, dates of birth and medical information.[34] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[35]

161.    Social Security numbers, for example, are among the most devastating kind of PII to have stolen because they may be put to numerous serious fraudulent uses and are difficult for

---

[31] Louis DeNicola, EXPERIAN, *What Is the Dark Web?*, May 12, 2021, available at
https://www.experian.com/blogs/ask-experian/what-is-the-dark-web (last visited July 20, 2023).
[32] *Id.*
[33] *What is the Dark Web?* – Microsoft 365, July 15, 2022, *available at* https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited July 20, 2023).
[34] *Id.*; *see also* Louis DeNicola, *supra*.
[35] *What is the Dark Web?* – Microsoft 365.

individuals to change. The Social Security Administration stresses that the loss of Social Security numbers, as occurred here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[36]

162.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

163.    Even then, obtaining a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[37]

164.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name, but with the thief's picture, use the victim's name and Social Security number to obtain government benefits, or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain jobs using stolen Social Security numbers, rent houses or receive medical services in the victims' names, and may even give that

---

[36] SSA, *Identity Theft and Your Social Security Number*, *supra*.
[37] Brian Naylor, NPR, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, Feb. 9, 2015, *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited July 20, 2023).

personal information to police during arrests resulting in arrest warrants being issued in victims' names. Identity thieves can use stolen Social Security numbers to apply for additional credit lines.

165.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[38]

166.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[39] Defendants, however, did not rapidly report to Plaintiffs and/or the Class that their PII had been stolen.

167.    Victims of identity theft also often suffer embarrassment, blackmail or harassment—in person or online, and/or experience financial losses resulting from fraudulently opened accounts or the misuse of existing accounts.

168.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones and/or dispute charges with creditors.

169.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen private information. To protect themselves, Plaintiffs and Class Members must, therefore, remain vigilant against unauthorized data use for years or even decades to come.

---

[38] *See 2019 Internet Crime Report*, FBI (Feb. 11, 2020), *available at* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 20, 2023).
[39] *Id.*

170.    The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses or why their information may be commercially valuable. Data is currency. Thus, the larger the data set, the greater potential for analysis and profit."[40]

171.    The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (1) encrypting information stored on computer networks, (2) retaining payment card information only as long as necessary, (3) properly disposing of personal information that is no longer needed, (4) limiting administrative access to business systems, (5) using industry-tested and accepted methods for securing data, (6) monitoring activity on networks to uncover unapproved activity, (7) verifying that privacy and security features function properly, (8) testing for common vulnerabilities, and (9) updating and patching third-party software.[41]

172.    According to the FTC, unauthorized PII disclosures are extremely damaging to consumers' finances, credit history and reputation and can take time, money and patience to resolve the fallout. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.[42]

---

[40] FTC, Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), Dec. 7, 2009, *available at* http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited July 20, 2023).
[41] *See* FTC, *Protecting Personal Information: A Guide for Business*, *available at* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited July 20, 2023).
[42] *See* FTC, *Commission Finds LabMD Liable for Unfair Data Security Practices*, *available at* https://www.ftc.gov/news-events/news/press-releases/2016/07/commission-finds-labmd-liable-unfair-data-security-practices (last visited July 20, 2023).

173.    Defendants' failure to properly and timely notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

## II.    Loss of Time to Mitigate the Risk of Identify Theft and Fraud

174.    As a result of the recognized risk of identity theft, when a Data Breach occurs and an individual is notified by a company that his/her PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm. In working to protect against future identity theft or fraud, however, an individual suffers harm to a different, but no less valuable, asset: time itself.

175.    Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must, as Defendants' notices of the Data Breach instructs them, to "[p]lease promptly review your credit reports and account statements over the next 12 to 24 months" [43] and "[i]t is recommended that you remain vigilant for incidents of fraud and identity theft." [44]

176.    Plaintiffs and Class Members have spent and will spend additional time in the future on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing, or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect.

---

[43] *See* BOA Data Breach Notification Letter.
[44] *See* Pathward Data Breach Notification Letter.

177.    Plaintiffs' and Class Members' mitigation efforts are consistent with the U.S. Government Accountability Office's 2007 report regarding data breaches (the "GAO Report"), in which the GAO noted that victims of identity theft will undoubtedly face "substantial costs and time to repair the damage to their good name and credit record."[45]

178.    Plaintiffs' and Class Members' mitigation efforts are also consistent with the steps that the FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit and correcting their credit reports.[46]

179.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[47]

---

[45]*See* GAO, GAO-07-737, *supra*.
[46] *See* FTC, *IdentityTheft.gov*, *available at* https://www.identitytheft.gov/Steps (last visited July 20, 2023).
[47] Jason Steele, *Credit Card and ID Theft Statistics*, Oct. 24, 2017, *available at* https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276 (last visited July 20, 2023).



180.    The GAO Report noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[48] Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit and correcting their credit reports.[49]

### III.    Diminution of Value of the Private Information

181.    Undisclosed PII and/or PHI are valuable property rights.[50] Their value is axiomatic, considering the consequences for theft of that data. Even this obvious risk-to-reward analysis illustrates beyond doubt that PHI and/or PII has considerable market value.

---

[48] *See* GAO Report, *supra* note 95, at 2.
[49] *See* FTC, IdentityTheft.gov, https://www.identitytheft.gov/Steps, *supra*.
[50] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies

182.    For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PII on the black market for the purpose of target-marketing their products and services.

183.    Sensitive PII can sell for as much as $363 per record, according to the Infosec Institute.[51] According to account monitoring company, LogDog, medical data, such as PHI, sells for $50 and up on the Dark Web.[52]

184.    An active and robust legitimate marketplace for private information like PII and/or PHI also exists. In 2019, the data brokering industry was worth roughly $200 billion.[53] In fact, the data marketplace is so sophisticated that consumers can sell their non-public information directly to a data broker who, in turn, aggregates the information and provides it to marketers or app developers.[54,55] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[56]

185.    As a result of the Data Breach, Plaintiffs' and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and potential release on the Dark Web, where it holds significant value for the threat actors.

---

obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[51] *See* Ashiq Ja, INFOSEC, *Hackers Selling Healthcare Data in the Black Market*, July 27, 2015, https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[52] Lisa Vaas, NAKED SECURITY, *Ransomware Attacks Paralyze and Sometimes Crush, Hospitals*, Oct. 3, 2019, *available at* https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last visited July 20, 2023)

[53] David Lazarus, LA TIMES, *Column: Shadowy data brokers make the most of their invisibility cloak*, Nov. 5, 2019), *available at* https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited July 20, 2023).

[54]    https://datacoup.com/ (last visited May 17, 2023).

[55]    https://digi.me/what-is-digime/.(last visited May 17, 2023).

[56]    Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited May 15, 2023).

IV.    **Loss of Benefit of the Bargain**

186.    Plaintiffs relied upon Defendant BOA and Pathward to provide or ensure adequate data security to protect their PII. Plaintiffs reasonably expected adequate data security as a basic assumption of their contractual relationship with BOA and Pathward.

187.    Had Plaintiffs known the Bank Defendants and John Doe 1-10 Defendants were sharing their PII with a third party, NCB, that had inadequate data security, they would not have engaged as a banking customer or provided their PII to the Bank Defendants.

188.    Plaintiffs are entitled to expectation damages on the different in banking service value considering the deficient data security and/or restitution for the conferred benefit in the form of account fees for the deficient data security that the Bank Defendants failed to provide.

V.    **Injunctive Relief Is Necessary to Protect against Future Data Breaches**

189.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including, but not limited to, ensuring that the storage of data or documents containing PII is not accessible online and that access to such data is password protected.

190.    Money damages are inadequate to fully compensate as Defendants are in exclusive control over their operations and control the manner in which they store Plaintiffs' and Class Members' PII.

191.    The deletion of unnecessary information is a low burden on Defendants. The implementation of other reasonable security measures is also achievable with a balanced costs and hardship on Defendants. Both types of injunctive relief are feasible and manageable for the court to enforce.

### VI.    Defendants' Representations and Privacy Policies

192.    Plaintiffs were and are very careful about sharing their PII. Plaintiffs have never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

193.    Plaintiffs stored any documents containing their PII in a safe and secure location or destroyed the documents. Moreover, Plaintiffs diligently chose unique usernames and passwords for their various online accounts.

194.    Plaintiffs took reasonable steps to maintain the confidentiality of their PII and relied on Defendants to keep their PII confidential and securely maintained, to use this information for related business purposes only, and to make only authorized disclosures of this information.

195.    BOA represents that customer security is its "top priority."[57] In fact, BOA's Privacy Policy states:

> To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings.[58]

196.    As a condition precedent to receiving banking services from BOA, Plaintiffs and Class Members who were BOA customers were required to provide sensitive PII. At that time, upon information and belief, Plaintiffs' and Class Members' PII was entered and stored on BOA's computer systems. Plaintiffs and Class Members did so with the understanding that BOA would take reasonable and appropriate measures to safeguard this confidential information with which it was entrusted.

197.    By acquiring, storing, and benefiting from Plaintiffs' PII, BOA owed and otherwise assumed non-delegable duties to safeguard Plaintiffs' PII. BOA, however, failed to provide or

---

[57] *See* https://www.bankofamerica.com/security-center/overview/ (last visited July 19, 2023).
[58] *See* https://www.bankofamerica.com/security-center/consumer-privacy-notice/ (last visited July 19, 2023).

ensure adequate data security and placed Plaintiffs' PII at risk of compromise and unauthorized disclosure in a foreseeable data breach

198.    In its Privacy Policy, Pathward assures its customers and potential customers that it takes steps to maintain the security of their Private Information, and states that:

> To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. The measures include computer safeguards and secured files and buildings. We also maintain other physical, electronic and procedural safeguards to protect this information and we limit access to information to those employees for whom access is appropriate.[59]

199.    As a condition precedent to receiving banking services from Pathward, upon information and belief, Plaintiffs and Class Members who were Pathward customers were required to provide sensitive PII. At that time, upon information and belief, Plaintiffs' and Class Members' PII was entered and stored on Pathward's computer systems. Plaintiffs and Class Members did so with the understanding that Pathward would take reasonable and appropriate measures to safeguard this confidential information with which it was entrusted.

200.    By acquiring, storing, and benefiting from Plaintiffs' PII, Pathward owed and otherwise assumed non-delegable duties to safeguard Plaintiffs' PII. Pathward, however, failed to provide or ensure adequate data security and placed Plaintiffs' PII at risk of compromise and unauthorized disclosure in a foreseeable data breach.

201.    Plaintiffs and Class Members place significant value on the security of their PII. Plaintiffs and Class Members provided their PII to the Bank Defendants and John Doe 1-10 Defendants with the understanding and expectation that their information would remain secure

---

[59] *See*
https://web.archive.org/web/20221220082906/https://www.pathward.com/content/dam/pathward/us/en/documents/pdfs/Privacy-Policy-Notice.pdf (last visited July 19, 2023).

and that any authorized third party custodian or vendor would be adequately screened and would employ reasonable and adequate and industry standard security measures to ensure that it would not be compromised.

202.    Adequate data security was an implied term and required full performance on the part of the Bank Defendants.  Had Plaintiffs known Bank Defendants were sharing the PII with a third party, NCB, that had inadequate data security, Plaintiffs and Class Members would not have engaged as a banking customer or provided their PII to Defendants.

203.    NCB knowingly acquired, stored, utilized, and benefited from Plaintiffs' PII during the course of its business operations. Upon information and belief, NCB acquired Plaintiffs' PII through Plaintiffs' banking and/or credit relationship with either of the Bank Defendants or John Doe 1-10 Defendants. The precise time, manner, and purpose by which Defendants acquired and utilized Plaintiffs' private information is within the exclusive control of Defendants.

204.    By acquiring, storing, and benefiting from Plaintiffs' PII, Defendants each owed and otherwise assumed duties to safeguard Plaintiffs' PII. Defendants, however, failed to provide adequate data security and placed Plaintiffs' and Class Members' PII at risk of compromise and unauthorized disclosure in a foreseeable data breach.

**VII.    Plaintiffs' Specific Experiences**

*Plaintiff Joseph Lindquist*

205.    Prior to the Data Breach, Plaintiff Lindquist was a customer of NCB and BOA and provided BOA his PII as a condition to receive banking and/or credit services. NCB serviced Plaintiff Lindquist's BOA account and therefore had access to his PII.

206.    Plaintiff Lindquist relied upon Defendants to provide or ensure adequate data security to protect his PII. Plaintiff Lindquist reasonably expected adequate data security as a basic assumption of his implied contractual relationship with NCB and BOA.

207.    Plaintiff Lindquist's PII was accessed and compromised due to Defendants' failures. Plaintiff Lindquist received a Notice Letter dated March 24, 2023, informing him that his first and last name, address, phone number, email address, date of birth, employment position, pay amount, driver's license number, Social Security number, account number, credit card number, routing number, account balance, and/or account status were exposed in the Data Breach, and that he should take specific steps to protect himself from future identity theft.

208.    In response and as a result of the Data Breach, Plaintiff Lindquist has spent time and effort researching the Data Breach and reviewing and monitoring his accounts for fraudulent activity. Plaintiff Lindquist estimates that he spent approximately 2 hours monitoring his accounts for suspicious activity, signing up for credit monitoring, and otherwise addressing the Data Breach.

### *Plaintiff Lillian Mardikian*

209.    Prior to the Data Breach, Plaintiff Mardikian was a customer of NCB and BOA and provided BOA her PII as a condition to receive banking and/or credit services. NCB serviced Plaintiff Mardikian's BOA account and therefore had access to her PII.

210.    Plaintiff Mardikian relied upon Defendants to provide or ensure adequate data security to protect her PII. Plaintiff Mardikian reasonably expected adequate data security as a basic assumption of her implied contractual relationship with NCB and BOA.

211.    Plaintiff Mardikian's PII was accessed and compromised due to Defendants' failures. Plaintiff Lindquist received a Notice Letter dated March 24, 2023, informing her that her first and last name, address, phone number, email address, date of birth, employment position, pay

amount, driver's license number, Social Security number, account number, credit card number, routing number, account balance, and/or account status were exposed in the Data Breach, and that she should take specific steps to protect herself from future identity theft.

212.    In response and as a result of the Data Breach, Plaintiff Mardikian has spent time and effort researching the Data Breach and reviewing and monitoring her accounts for fraudulent activity. Plaintiff Mardikian estimates that she spent approximately 13 to 15 hours monitoring her accounts for suspicious activity, signing up for credit monitoring, and otherwise addressing the Data Breach. Plaintiff Mardikian further signed up for credit monitoring as a result of the Data Breach at a rate of $20/month.

### Plaintiff Howard Suh

213.    Prior to the Data Breach, Plaintiff Suh was a customer of NCB and BOA and provided BOA his PII as a condition to receive banking and/or credit services. NCB serviced Plaintiff Suh's BOA account and therefore had access to his PII.

214.    Plaintiff Suh relied upon Defendants to provide or ensure adequate data security to protect his PII. Plaintiff Suh reasonably expected adequate data security as a basic assumption of his implied contractual relationship with NCB and BOA.

215.    Plaintiff Suh's PII was accessed and compromised due to Defendants' failure. He received a Notice Letter dated March 24, 2023 informing him that his fist and last name, address, phone number, email address, date of birth, employment position, pay amount, driver's license number, Social Security number, account number, credit card number, routing number, account balance, and/or account status were exposed in the Data Breach and that he should take specific steps to protect himself from future identity theft.

216.    In response and as a result of the Data Breach, Plaintiff Suh spent time and effort researching the Data Breach and reviewing and monitoring his accounts for fraudulent activity. He also had to change his automatic billing instructions tied to the compromised BOA account.

217.    Notably, following the Data Breach, Plaintiff Suh experienced actual fraud and identity theft. In particular, following the Data Breach, an unauthorized and unknown third party submitted a loan application in his name, which was recorded on his Experian account. He also experienced unauthorized charges in the amount of $30 to his bank account in March. This was the same bank account that was compromised in the NCB Data Breach.

218.    Further, Plaintiff Suh has received emails from Venmo that someone was trying to login to his account. Plaintiff Suh also received an email that someone was trying to apply for a loan in his name through an unknown company.

219.    Moreover, following the Data Breach, Plaintiff Suh experienced an excessive increase in spam calls on his phone, forcing him to change his phone number.

220.    In total, Plaintiff Suh estimates he spent approximately 15 hours addressing the Data Breach and fraudulent activity on his accounts.

*Plaintiff Ernesto Medina*

221.    Prior to the Data Breach, Plaintiff Medina was a customer of NCB and BOA and provided BOA his PII as a condition to receive banking and/or credit services. NCB serviced Plaintiff Medina's BOA account and therefore had access to his PII.

222.    Plaintiff Medina relied upon Defendants to provide or ensure adequate data security to protect his PII. Plaintiff Medina reasonably expected adequate data security as a basic assumption of his implied contractual relationship with NCB and BOA.

223.    Plaintiff Medina's PII was accessed and compromised due to Defendants' failures. He received a Notice Letter dated March 24, 2023 informing him that his first and last name, address, phone number, email address, date of birth, employment position, pay amount, driver's license number, Social Security number, account number, credit card number, routing number, account balance, and/or account status were exposed in the Data Breach and that he should take specific steps to protect himself from future identity theft.

224.    In response and as a result of the Data Breach, Plaintiff Medina has spent time and effort researching the Data Breach and reviewing and monitoring his accounts for fraudulent activity. Plaintiff Medina estimates that he spent approximately 8 hours monitoring his accounts for suspicious activity and otherwise addressing the Data Breach.

### Plaintiff Benedict Lozada

225.    Prior to the Data Breach, Plaintiff Lozada was a customer of NCB. NCB serviced Plaintiff Lozada's account that had gone to collections and therefore had access to his PII. Plaintiff Lozada received a Data Breach Notification letter purportedly from NCB purportedly pertaining to a Pathward account.

226.    Plaintiff Lozada relied upon Defendants to provide or ensure adequate data security to protect his PII. Plaintiff Lozada reasonably expected adequate data security as a basic assumption of his implied contractual relationship with NCB and Pathward.

227.    Plaintiff Lozada's PII was accessed and compromised due to Defendants' failures. Plaintiff Lozada received a Notice Letter dated May 22, 2023 informing him that his first and last name, and Social Security number were exposed in the Data Breach and that he should take specific steps to protect himself from future identity theft.

228.    In response and as a result of the Data Breach, Plaintiff Lozada has spent time and effort researching the Data Breach and reviewing and monitoring his accounts for fraudulent activity. Plaintiff Lozada estimates that he spent approximately several hours monitoring his accounts for suspicious activity and otherwise addressing the Data Breach.

### Plaintiff Edward Del Hierro

229.    Prior to the Data Breach, Plaintiff Del Hierro was a customer of NCB. NCB serviced Plaintiff Del Hierro's account that had gone to collections and therefore had access to his PII. Plaintiff Del Hierro received a Data Breach Notification letter purportedly from NCB purportedly pertaining to a Pathward account.

230.    Plaintiff Del Hierro relied upon Defendants to provide or ensure adequate data security to protect his PII. Plaintiff Del Hierro reasonably expected adequate data security as a basic assumption of his implied contractual relationship with NCB and Pathward.

231.    Plaintiff Del Hierro's PII was accessed and compromised due to Defendants' failures. Plaintiff Del Hierro received a Notice Letter dated May 23, 2023 informing him that his first and last name, and Social Security number were exposed in the Data Breach and that he should take specific steps to protect himself from future identity theft.

232.    In response and as a result of the Data Breach, Plaintiff Del Hierro has spent time and effort researching the Data Breach and reviewing and monitoring his accounts for fraudulent activity. Plaintiff Del Hierro estimates that he spent approximately 15 hours monitoring his accounts for suspicious activity and otherwise addressing the Data Breach.

*Plaintiff Kylie Meyer*

233.    Prior to the Data Breach, Plaintiff Meyer was a customer of NCB and BOA and provided BOA her PII as a condition to receive banking and/or credit services. NCB serviced Plaintiff Meyer's BOA account and therefore had access to her PII.

234.    Plaintiff Meyer relied upon Defendants to provide or ensure adequate data security to protect her PII. Plaintiff Meyer reasonably expected adequate data security as a basic assumption of her implied contractual relationship with NCB and BOA.

235.    Plaintiff Meyer's PII was accessed and compromised due to Defendants' failures. Plaintiff Meyer received a Notice Letter dated March 24, 2023, informing her that her first and last name, address, phone number, email address, date of birth, employment position, pay amount, driver's license number, Social Security number, account number, credit card number, routing number, account balance, and/or account status were exposed in the Data Breach, and that she should take specific steps to protect herself from future identity theft.

236.    In response and as a result of the Data Breach, Plaintiff Meyer has spent time and effort researching the Data Breach and reviewing and monitoring her accounts for fraudulent activity. Plaintiff Meyer also experienced a fraudulent charge of $9.64 on her debit card after the period of the Data Breach that she did not authorize. This debit card was connected to the same BOA account that was compromised in the Data Breach.

*Plaintiff Tobi Patterson*

237.    Prior to the Data Breach, Plaintiff Patterson was a customer of NCB and BOA and provided BOA her PII as a condition to receive banking and/or credit services. NCB serviced Plaintiff Patterson's BOA account and therefore had access to her PII.

238.    Plaintiff Patterson relied upon Defendants to provide or ensure adequate data security to protect her PII. Plaintiff Patterson reasonably expected adequate data security as a basic assumption of her implied contractual relationship with NCB and BOA.

239.    Plaintiff Patterson's PII was accessed and compromised due to Defendants' failures. Plaintiff Patterson received a Notice Letter dated May 23, 2023, informing her that her first and last name, and Social Security number were exposed in the Data Breach and that she should take specific steps to protect herself from future identity theft.

240.    In response and as a result of the Data Breach, Plaintiff Patterson has spent time and effort researching the Data Breach and reviewing and monitoring her accounts for fraudulent activity. Plaintiff Patterson also experienced actual fraud and identity theft.

241.    Moreover, following the Data Breach, Plaintiff Patterson has experienced actual fraud and misuse of her PII. Specially, an unauthorized and unknown third party applied for a secondary debit card SMI ONE in her name, and she received emails from loan companies that loans had been applied for in her name. Plaintiff Patterson also received an email from Experian indicating that an account was created using her email under the name "William" which she did not authorize. In addition, Plaintiff Patterson experienced fraudulent charges on her payment card in the amount of $538 and a $35 charge for child support; Plaintiff Patterson did not authorize either of these charges. Notably, the card with the fraudulent activity was the same card that was tied to the compromised BOA account that was impacted by the Data Breach.

242.    In response and as a result of the Data Breach, Plaintiff Patterson estimates that she spent approximately 25 hours addressing these issues, some of which are ongoing (including seeking reimbursement for the fraudulent charges). Plaintiff Patterson also spent approximately $30 to travel to the police department and the post office to address the instances of fraud.

*Plaintiff Jude-Law Palmer*

243.    Prior to the Data Breach, Plaintiff Palmer was a customer of NCB and BOA and provided BOA his PII as a condition to receive banking and/or credit services. NCB serviced Plaintiff Palmer's BOA account and therefore had access to his PII.

244.    Plaintiff Palmer relied upon Defendants to provide or ensure adequate data security to protect his PII. Plaintiff Palmer reasonably expected adequate data security as a basic assumption of his implied contractual relationship with NCB and BOA.

245.    Plaintiff Palmer's PII was accessed and compromised due to Defendants' failures. Plaintiff Palmer received a Notice Letter dated March 24, 2023 informing him this his first and last name, address, phone number, email address, date of birth, employment position, pay amount, driver's license number, Social Security number, account number, credit card number, routing number, account balance, and/or account status was exposed in the Data Breach, and that he should take specific steps to protect himself from future identity theft.

246.    In response and as a result of the Data Breach, Plaintiff Palmer has spent time and effort researching the Data Breach and reviewing and monitoring his accounts for fraudulent activity.

247.    Plaintiff Palmer has additionally experienced an increase in spam calls following the Data Breach. He also received a suspicious invoice from PayPal that he did not recognize. Plaintiff Palmer estimates that he spent approximately 2.5 hours monitoring his accounts for suspicious activity, changing his passwords, freezing accounts, calling his bank, signing up for credit monitoring, and otherwise addressing the Data Breach.

***Plaintiff Kevin Bliss***

248.    Prior to the Data Breach, Plaintiff Kevin Bliss was a customer of NCB and BOA and provided BOA his PII as a condition to receive banking and/or credit services. NCB serviced Plaintiff Bliss's BOA account and therefore had access to his PII.

249.    Plaintiff Bliss relied upon Defendants to provide or ensure adequate data security to protect his PII. Plaintiff Bliss reasonably expected adequate data security as a basic assumption of his implied contractual relationship with NCB and BOA.

250.    Plaintiff Bliss's PII was accessed and compromised due to Defendants' failures. He received a Notice Letter dated March 24, 2023 informing him that his first and last name, address, phone number, email address, date of birth, employment position, pay amount, driver's license number, Social Security number, account number, credit card number, routing number, account balance, and/or account status were exposed in the Data Breach and that he should take specific steps to protect himself from future identity theft.

251.    In response and as a result of the Data Breach, Plaintiff Bliss has spent time and effort researching the Data Breach and reviewing and monitoring his accounts for fraudulent activity. Plaintiff Bliss estimates that he spent approximately 5 hours monitoring his accounts for suspicious activity and otherwise addressing the Data Breach.

252.    On or around April 16, 2023, Plaintiff Bliss received a letter from BOA indicating that someone fraudulently attempted to open up a BOA deposit account in his name.

***Plaintiff Michael Teixeira***

253.    Prior to the Data Breach, Plaintiff Teixeira was a customer of NCB and BOA and provided BOA his PII as a condition to receive banking and/or credit services. NCB serviced Plaintiff Teixeira's BOA account and therefore had access to his PII.

254.    Plaintiff Teixeira relied upon Defendants to provide or ensure adequate data security to protect his PII. Plaintiff Teixeira reasonably expected adequate data security as a basic assumption of his implied contractual relationship with NCB and BOA.

255.    Plaintiff Teixeira's PII was accessed and compromised due to Defendants' failures. He received a Notice Letter dated March 24, 2023 informing him that his first and last name, address, phone number, email address, date of birth, employment position, pay amount, driver's license number, Social Security number, account number, credit card number, routing number, account balance, and/or account status were exposed in the Data Breach and that he should take specific steps to protect himself from future identity theft.

256.    In response and as a result of the Data Breach, Plaintiff Teixeira has spent time and effort researching the Data Breach and reviewing and monitoring his accounts for fraudulent activity. Plaintiff Teixeira estimates that he spent approximately 5-10 hours monitoring his accounts for suspicious activity and otherwise addressing the Data Breach.

257.    Furthermore, immediately after the Data Breach, Plaintiff Teixeira's password manager software on his iPhone indicated that his passwords associated with his GEICO and ADP accounts showed that his passwords had "appeared in a data leak" which "puts this account at high risk of compromise."

***Plaintiff Diane Ross***

258.    Prior to the Data Breach, Plaintiff Ross was a customer of NCB. NCB serviced Plaintiff Ross's account that had gone to collections and therefore had access to her PII. Plaintiff Ross received a Data Breach Notification letter purportedly from NCB purportedly pertaining to a Pathward account.

259.    Plaintiff Ross relied upon Defendants to provide or ensure adequate data security to protect her PII. Plaintiff Ross reasonably expected adequate data security as a basic assumption of her implied contractual relationship with NCB and Pathward.

260.    Plaintiff Ross's PII was accessed and compromised due to Defendants' failures. Plaintiff Ross received a Notice Letter dated May 23, 2023 informing her that her first and last name, and Social Security number were exposed in the Data Breach and that she should take specific steps to protect herself from future identity theft.

261.    In response and as a result of the Data Breach, Plaintiff Ross has spent time and effort researching the Data Breach and reviewing and monitoring her accounts for fraudulent activity. Plaintiff Ross estimates that she spent approximately 8-10 hours monitoring her accounts for suspicious activity and otherwise addressing the Data Breach.

262.    After the Data Breach occurred Plaintiff Ross's BOA account experienced approximately $1,200 in fraudulent charges.

### Plaintiff Jacqueline O'Brien

263.    Prior to the Data Breach, Plaintiff O'Brien was a customer of NCB. NCB serviced Plaintiff O'Brien's account that had gone to collections and therefore had access to her PII. Plaintiff O'Brien received a Data Breach Notification letter purportedly from NCB purportedly pertaining to a Pathward account.

264.    Plaintiff O'Brien relied upon Defendants to provide or ensure adequate data security to protect her PII. Plaintiff O'Brien reasonably expected adequate data security as a basic assumption of her implied contractual relationship with NCB and Pathward.

265.    Plaintiff O'Brien's PII was accessed and compromised due to Defendants' failures. Plaintiff O'Brien received a Notice Letter dated May 23, 2023 informing her that her first and last

name, and Social Security number were exposed in the Data Breach and that she should take specific steps to protect herself from future identity theft.

266.    In response and as a result of the Data Breach, Plaintiff O'Brien has spent time and effort researching the Data Breach and reviewing and monitoring her accounts for fraudulent activity. Plaintiff O'Brien estimates that she spent approximately 7 hours monitoring her accounts for suspicious activity and otherwise addressing the Data Breach.

### *Plaintiff Kelly Matts*

267.    Prior to the Data Breach, Plaintiff Matts was a customer of NCB. NCB serviced Plaintiff Matts's account that had gone to collections and therefore had access to her PII. Plaintiff Matts received a Data Breach Notification letter purportedly from NCB purportedly pertaining to a Pathward account, however her NCB account pertained to debt she owed from a Rise Credit of California account.

268.    Plaintiff Matts relied upon Defendants to provide or ensure adequate data security to protect her PII. Plaintiff Matts reasonably expected adequate data security as a basic assumption of her implied contractual relationship with NCB.

269.    Plaintiff Matts's PII was accessed and compromised due to Defendants' failures. Plaintiff Matts received a Notice Letter dated May 23, 2023 informing her that her first and last name, and Social Security number were exposed in the Data Breach and that she should take specific steps to protect herself from future identity theft.

270.    In response and as a result of the Data Breach, Plaintiff Matts has spent time and effort researching the Data Breach and reviewing and monitoring her accounts for fraudulent activity. Plaintiff Matts estimates that she spent approximately several hours monitoring her accounts for suspicious activity and otherwise addressing the Data Breach.

271.     Furthermore, Plaintiff Matts's credit monitoring/identity theft monitoring software alerted and revealed that her Personal Information is now on the dark web.

**Plaintiff Micael Martin**

272.     Prior to the Data Breach, Plaintiff Micael Martin was a customer of NCB. NCB serviced Plaintiff Martin's account that had gone to collections and therefore had access to her PII. Plaintiff Martin received a Data Breach Notification letter purportedly from NCB purportedly pertaining to a Pathward account, however her NCB account pertained to debt she owed from a Rise Credit of California account.

273.     Plaintiff Martin relied upon Defendants to provide or ensure adequate data security to protect her PII. Plaintiff Martin reasonably expected adequate data security as a basic assumption of her implied contractual relationship with NCB.

274.     Plaintiff Martin's PII was accessed and compromised due to Defendants' failures. Plaintiff Martin received a Notice Letter dated May 23, 2023 informing her that her first and last name, and Social Security number were exposed in the Data Breach and that she should take specific steps to protect herself from future identity theft.

275.     In response and as a result of the Data Breach, Plaintiff Martin has spent time and effort researching the Data Breach and reviewing and monitoring her accounts for fraudulent activity. Plaintiff Martin estimates that she spent approximately 5 hours monitoring her accounts for suspicious activity and otherwise addressing the Data Breach.

**Plaintiff Timothy Beeker**

276.     Prior to the Data Breach, Plaintiff Beeker was a customer of NCB and BOA and provided BOA his PII as a condition to receive banking and/or credit services. NCB serviced Plaintiff Beeker's BOA account and therefore had access to his PII.

277.    Plaintiff Beeker relied upon Defendants to provide or ensure adequate data security to protect his PII. Plaintiff Beeker reasonably expected adequate data security as a basic assumption of his implied contractual relationship with NCB and BOA.

278.    Plaintiff Beeker's PII was accessed and compromised due to Defendants' failures. Plaintiff Beeker received a Notice Letter dated May 22, 2023 informing him that his first and last name, and Social Security number were exposed in the Data Breach and that he should take specific steps to protect himself from future identity theft.

279.    In response and as a result of the Data Breach, Plaintiff Beeker has spent time and effort researching the Data Breach and reviewing and monitoring his accounts for fraudulent activity. Plaintiff Beeker estimates that he spent approximately 6 hours monitoring his accounts for suspicious activity and otherwise addressing the Data Breach.

280.    Plaintiff Beeker further put a freeze on his Social Security number and credit cards. Plaintiff Beeker has additionally been experiencing an increase in spam calls since the Data Breach.

281.    Plaintiffs and Class Members suffered actual damages as a result of the failures of Defendants to adequately protect the sensitive information entrusted to it, including, without limitation, experiencing fraud or attempted fraud, purchasing credit monitoring as a result of the breach, time related to monitoring their accounts for fraudulent activity, exposure to increased and imminent risk of fraud and identity theft, the loss in value of their personal information, and other economic and non-economic harm.  Plaintiffs and Class Members will now be forced to expend additional time to review their credit reports and monitor their accounts for fraud or identity theft.

282.    As a result of the Data Breach, Plaintiffs and Class Members have been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages

for years to come. Such risk is certainly real and impending and is not speculative given the highly

sensitive nature of the PII compromised by the Data Breach.

## CLASS ACTION ALLEGATIONS

283.    Plaintiffs brings this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2), and (b)(3) on behalf of the following Nationwide Class:

> All persons in the United States whose PII was compromised in the
> Data Breach first made public by NCB in March 2023, and as
> supplemented by NCB in May 2023 (the "Nationwide Class").

284.    Plaintiffs reserve the right to modify, expand or amend the above Nationwide Class

definition or to seek certification of a class or classes defined differently than above before any

court determines whether certification is appropriate following discovery.

## STATE SUBCLASSES

285.    Plaintiffs brings this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2), and (b)(3) on behalf of the following State Subclasses:

**Florida Subclass**

> All persons in Florida whose PII was compromised in the Data
> Breach first made public by NCB in March 2023, and as
> supplemented by NCB in May 2023 (the "Florida Subclass").

**California Subclass**

> All persons in California whose PII was compromised in the Data
> Breach first made public by NCB in March 2023, and as
> supplemented by NCB in May 2023 (the "California Subclass").

**New York**

> All persons in New York whose PII was compromised in the Data
> Breach first made public by NCB in March 2023, and as
> supplemented by NCB in May 2023 (the "New York Subclass").

**Texas**

All persons in Texas whose PII was compromised in the Data Breach first made public by NCB in March 2023, and as supplemented by NCB in May 2023 (the "Texas Subclass").

**Georgia**

All persons in Georgia whose PII was compromised in the Data Breach first made public by NCB in March 2023, and as supplemented by NCB in May 2023 (the "Georgia Subclass").

**Oregon**

All persons in Oregon whose PII was compromised in the Data Breach first made public by NCB in March 2023, and as supplemented by NCB in May 2023 (the "Oregon Subclass").

**Massachusetts**

All persons in Massachusetts whose PII was compromised in the Data Breach first made public by NCB in March 2023, and as supplemented by NCB in May 2023 (the "Massachusetts Subclass").

286.    Plaintiffs reserve the right to modify, expand or amend the above Florida, California, New York, Texas, Georgia, Oregon, and Massachusetts Subclass definitions or to seek certification of a class or classes defined differently than above before any court determines whether certification is appropriate following discovery.

287.    Certification of Plaintiffs' claims for class-wide treatment are appropriate because all elements of Fed. R. Civ. P. 23(a) and (b)(2)-(3) are satisfied. Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

288.    **Numerosity**. All requirements of Fed. R. Civ. P. 23(a)(1) are satisfied. The Members of the Nationwide Class and State Subclasses are so numerous and geographically

dispersed that individual joinder of all Class and Subclass Members is impractical. While Plaintiffs are informed and believe that there are likely millions of thousands of Members of the Classes, the precise number of Class and Subclass Members is unknown to Plaintiffs. According to information released by the Maine Attorney General, the number of persons affected is approximately 1,582,811 between BOA (494,969) and Pathward and other institutions (1,087,842).

289.    Class Members may be identified through objective means. Indeed, Defendants have largely done so already. Class Members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

290.    **Commonality and Predominance**. All requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) are satisfied. This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

a.  Whether Defendants engaged in active misfeasance and misconduct alleged herein;

b.  Whether Defendants owed a duty to Class Members to safeguard their sensitive personal information;

c.  Whether Defendants breached their duty to Class Members to safeguard their sensitive personal information;

d.  Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

e.  Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of the Data Breach;

f.  Whether Defendants' failure to provide adequate security proximately caused Plaintiffs' and Class Members' injuries; and

g.  Whether Plaintiffs and Class Members are entitled to declaratory and injunctive relief.

291.  **Typicality.** All requirements of Fed. R. Civ. P. 23(a)(3) are satisfied. Plaintiffs' claims are typical of the claims of all Class and Subclass Members because Plaintiffs, like other Class and Subclass Members, suffered theft of their sensitive personal information in the Data Breach.

292.  **Adequacy of Representation.** All requirements of Fed. R. Civ. P. 23(a)(4) are satisfied. Plaintiffs are adequate Class representatives because they are Members of the Class and State Subclasses their interests do not conflict with the interests of other Class and Subclass Members that they seek to represent. Plaintiffs are committed to pursuing this matter for the Class with the Class's collective best interest in mind. Plaintiffs have retained counsel competent and experienced in complex class action litigation of this type and Plaintiffs intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the Class's interests.

293.  **Predominance and Superiority.** All requirements of Fed. R. Civ. P. 23(b)(3) are satisfied. As described above, common issues of law or fact predominate over individual issues. Resolution of those common issues in Plaintiffs' case will also resolve them for the Class's claims. In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and other Class Members are relatively small compared to the burden and expense that would be

required to individually litigate their claims against Defendants, so it would be impracticable for Members of the Class to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

294.    **Cohesiveness**. All requirements of Fed. R. Civ. P. 23(b)(2) are satisfied. Defendants have acted, or refused to act, on grounds generally applicable to the Nationwide Class and Subclasses such that final declaratory or injunctive relief is appropriate.

295.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on newly learned facts or legal developments that arise following additional investigation, discovery, or otherwise.

**CLAIMS FOR RELIEF**

**COUNT I**
**NEGLIGENCE**
**(By all Plaintiffs on behalf of the Nationwide Class**
**(or, alternatively, each of the State Subclasses) against NCB)**

296.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

297.    NCB obtained, collected, transferred and stored Plaintiffs' and Class Members' PII in connection with its debt collection and accounts management operations.

298.    By collecting and maintaining sensitive personal information, NCB had a common law duty of care to use reasonable means to secure and safeguard the sensitive personal information and to prevent disclosure of the information to unauthorized individuals. NCB's duty included a

66

responsibility to implement processes by which it could detect a data breach of this type and magnitude in a timely manner.

299.    NCB owed a duty of care to Plaintiffs and Class Members to provide data security consistent with the various statutory requirements, regulations, and other notices described above.

300.    NCB was in a position to ensure that its servers and systems were sufficient to protect against the foreseeable risk that a data breach could occur that would result in substantial harm to Plaintiffs and Class Members.

301.    NCB was subject to an "independent duty" untethered to any contract between Plaintiffs and Class Members and Defendants.

302.    NCB breached its duties, and thus was negligent, by failing to use reasonable measures to protect customers' sensitive personal information. Defendants' negligent acts and omissions include, but are not limited to, the following:

    a.   failure to employ systems and educate employees and others to protect against malware and/or ransomware;

    b.   failure to comply with industry standards for software and server security;

    c.   failure to track and monitor access to its network and personal information;

    d.   failure to limit access to those with a valid purpose;

    e.   failure to adequately staff and fund its data security operation;

    f.   failure to remove, delete, or destroy highly sensitive personal information of consumers that is no longer being used for any valid business purpose;

    g.   failure to use due care in hiring, promoting, and supervising those responsible for its data security operations; and

> h.  failure to recognize that hackers were stealing personal information from its
> network while the Data Breach was taking place.

303.    It was foreseeable to NCB that a failure to use reasonable measures to protect its customers' sensitive personal information could result in injury to consumers. Further, actual and attempted breaches of data security were reasonably foreseeable to NCB given the known frequency of data breaches and various warnings from industry experts.

304.    As a direct and proximate result of NCB's negligence, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members are entitled to actual, compensatory, consequential, incidental, punitive, and nominal damages, in an amount to be proven at trial.

305.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for a time period to be determined at trial.

**COUNT II**
**NEGLIGENCE**
**(By all Plaintiffs[60] on behalf of the Nationwide Class (or, alternatively, each of the State Subclasses) against the Bank Defendants and John Doe 1-10 Defendants)**

306.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

307.    The Bank Defendants and John Doe 1-10 Defendants obtained and collected and stored Plaintiffs' and Class Members' PII. They then shared this highly sensitive information with NCB. Before doing so, the Bank Defendants and John Doe 1-10 Defendants conducted (or should

---

[60] Plaintiffs Matts and Martin do not assert negligence claims against Pathward.

have conducted) due diligence to ensure that any vendors with which they were sharing customer data would have reasonable security measures in place to protect it.

308.    By collecting, maintaining, and sharing their customers' sensitive personal information, the Bank Defendants and John Doe 1-10 Defendants had a common law non-delegable duty of care to use reasonable means to secure and safeguard the sensitive personal information and to prevent disclosure of the information to unauthorized individuals. The Bank Defendants' and John Doe 1-10 Defendants' duty included a responsibility to implement processes by which it could detect a data breach of this type and magnitude in a timely manner.

309.    The Bank Defendants and John Doe 1-10 Defendants owed a non-delegable duty of care to Plaintiffs and Class Members to provide (and to ensure that their vendors provide) data security consistent with the various statutory requirements, regulations, and other notices described above.

310.    The Bank Defendants and John Doe 1-10 Defendants were in a position to ensure that the servers and systems of the vendors it selected to entrust with sensitive customer data were sufficient to protect against the foreseeable risk that a data breach could occur that would result in substantial harm to Plaintiffs and Class Members.

311.    The Bank Defendants and John Doe 1-10 Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect customers' sensitive personal information. The Bank Defendants' and John Doe 1-10 Defendants' negligent acts and omissions include, but are not limited to, the following:

> a.    failure to employ systems and educate employees and vendors to protect against malware and/or ransomware;

b.   failure to ensure that NCB complied with industry standards for software and server security;

c.   failure to ensure that NCB tracked and monitored access to its network and personal information;

d.   failure to ensure that NCB limited access to those with a valid purpose;

e.   failure to ensure that NCB adequately staffed and funded its data security operation;

f.   failure to ensure that NCB removed, deleted, or destroyed highly sensitive personal information of consumers that is no longer being used for any valid business purpose;

g.   failure to ensure that NCB used due care in hiring, promoting, and supervising those responsible for its data security operations; and

312.   The Bank Defendants and John Doe 1-10 Defendants further failed to ensure that NCB would reasonably recognize that hackers were stealing personal information from its network while the Data Breach was taking place.

313.   It was foreseeable to the Bank Defendants and John Doe 1-10 Defendants that NCB would fail to use reasonable measures to protect its customers' sensitive personal information which could result in injury to consumers. Further, actual and attempted breaches of data security were reasonably foreseeable to the Bank Defendants given the known frequency of data breaches and various warnings from industry experts. aa

314.   As a direct and proximate result of the Bank Defendants' and John Doe 1-10 Defendants' negligence, Plaintiffs and Class Members sustained damages as alleged herein.

Plaintiffs and Class Members are entitled to actual, compensatory, consequential, incidental, punitive, and nominal damages, in an amount to be proven at trial.

315.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, among other things: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for their lifetime.

**COUNT III**
**NEGLIGENCE *PER SE***
**Negligence *Per Se* Under Section 5 of the FTC Act**
**(By all Plaintiffs[61] on behalf of the Nationwide Class**
**(or, alternatively, each of the State Subclasses) against all Defendants)**

316.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

317.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Defendants for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendants' duty.

318.    Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with the industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and disclosed and the foreseeable consequences of a data breach.

319.    Plaintiffs and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

---

[61] Plaintiffs Matts and Martin do not assert negligence *per se* claims against Pathward.

320.    Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

321.    Defendants' violation of Section 5 of the FTC Act constitutes negligence per se.

322.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have been injured as described herein and above and are entitled to damages, including actual, compensatory, consequential, incidental, punitive, and nominal damages, in an amount to be proven at trial.

323.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for their lifetime.

### Negligence *Per Se* Under the DPPA
### (By all Plaintiffs on behalf of the Nationwide Class
### (or, alternatively, each of the State Subclasses) against NCB)

324.    The DPPA states that "[i]t shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title." 18 U.S.C. § 2722(a).

325.    The DPPA also states that "[a] [s]tate department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity: (1) personal information, as defined in 18 U.S.C. 2725(3), about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section. . . ." 18 U.S.C. § 2721(a)(1).

326.    As alleged herein, NCB utilizes PII obtained from motor vehicle records, including driver's license numbers.

327.    Under the DPPA, NCB owed a duty to Plaintiffs and other Class Members to protect and not disclose their PII, including driver's license numbers, obtained from motor vehicle records.

328.    NCB violated the DPPA by intentionally configuring and designing its servers and systems to disclose Plaintiffs' and Class Members' PII. NCB installed no protections or security measures to protect this information and willfully disclosed it to cyber criminals through the intentional configuration and design of its servers and systems. NCB's conduct was particularly unreasonable given the nature and amount of PII it obtained and disclosed and the foreseeable consequences of a data breach.

329.    Alternatively, NCB had constructive notice that it had disclosed the PII of Plaintiffs and Class Members to unauthorized third parties because it should have been aware that configuring and designing its servers and systems to disclose Plaintiffs' and Class Members' PII to cyber criminals would cause the disclosure of this information.

330.    At the very least, NCB was willfully ignorant that its servers and systems were configured without any protections to store Plaintiffs' and Class Members' PII and would disclose that personal information to cyber criminals.

331.    Plaintiffs and Class Members are within the class of persons that the DPPA was intended to protect against because the DPPA was expressly designed to protect a person's personal information contained in motor vehicle records from unauthorized disclosure.

332.    Moreover, the harm that has occurred is the type of harm the DPPA is intended to guard against, i.e., the unauthorized disclosure of personal information from motor vehicle records.

333.    NCB's violation of the DPPA constitutes negligence *per se*.

334.    As a direct and proximate result of NCB's negligence, Plaintiffs and Class Members have been injured, as described herein and above, and are entitled to damages, including actual, compensatory, consequential, incidental, punitive, and nominal damages, in an amount to be proven at trial.

335.    Plaintiffs and Class Members are also entitled to injunctive relief requiring NCB to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for their lifetime.

## Negligence *Per Se* Under the GLBA
### (By all Plaintiffs[62] on behalf of the Nationwide Class, or, alternatively, each of the State Subclasses against the Bank Defendants and John Doe 1-10 Defendants)

336.    Similarly, the Safeguards Rule, which implements Section 501(b) of the GLBA,15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

337.    The Bank Defendants and John Doe 1-10 Defendants violated the Safeguards Rule by failing to assess reasonably foreseeable risks to the security, confidentiality, and integrity of PII in its custody or control; failing to design and implement information safeguards to control the risks identified through risk assessment, and regularly test or otherwise monitor the effectiveness of the safeguards' key controls, systems, and procedures; failing to adequately oversee service providers; and failing to evaluate and adjust its information security program in

---

[62] Plaintiffs Matts and Martin do not assert negligence *per se* claims against Pathward.

light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances.

338.    The Bank Defendants' and John Doe 1-10 Defendants' violations of the GLBA constitute negligence *per se*.

339.    Plaintiffs and Class Members are within the class of persons that the GLBA was intended to protect.

340.    The harm that occurred as a result of the Data Breach is the type of harm the GLBA was intended to guard against.

341.    As a direct and proximate result of the Bank Defendants' and John Doe 1-10 Defendants' negligence *per se* under the FTCA and GLBA, Plaintiffs and the Class have suffered, continue to suffer, and will suffer, injuries, damages, and harm as set forth herein.

342.    Whether under the FTC Act, DPPA, or GLBA each independently constitutes negligence *per se*.

## COUNT IV
## WILLFUL VIOLATION OF THE FAIR CREDIT REPORTING ACT
### (By all Plaintiffs[63] on behalf of the Nationwide Class (or, alternatively, each of the State Subclasses) against all Defendants)

343.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

344.    One of the fundamental purposes of FCRA is to protect consumers' privacy. 15 U.S.C. § 1681(a). Protecting consumers' privacy involves adopting reasonable procedures to keep sensitive information confidential. 15 U.S.C. § 1681(b).

345.    FCRA defines a "consumer reporting agency" as:

> [A]ny person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating

---

[63] Plaintiffs Matts and Martin do not assert FCRA claims against Pathward.

consumer credit information or other information on consumers for the purpose of
furnishing consumer reports to third parties, and which uses any means or facility of
interstate commerce for the purpose of preparing or furnishing consumer reports.
15 U.S.C. § 1681a(f).

346.    FCRA defines a "consumer report" as:

[A]ny written, oral, or other communication of any information by a consumer
reporting agency bearing on a consumer's creditworthiness, credit standing, credit
capacity, character, general reputation, personal characteristics, or mode of living
which is used or expected to be used or collected in whole or in part for the purpose
of establishing the consumer's eligibility for (A) credit or insurance to be used
primarily for personal, family, or household purposes; (B) employment purposes; or
(C) any other purpose authorized under [15U.S.C. §] 1681(b).
15 U.S.C. § 1681a(d)(1).

347.    In exchange for monetary fees, Defendant regularly assembles consumer

information including, among other things, names, dates of birth, Social Security Numbers, bank

account numbers, and debts. Defendant also regularly utilizes interstate commerce to furnish such

information on consumers (consumer reports) to third parties.

348.    Plaintiffs' and Class Members' PII constitute Consumer Reports under FCRA,

because this information bears on, among other things, their credit worthiness, credit standing,

credit capacity, character, general reputation, personal characteristics, physical/medical

conditions, and mode of living, and is used or collected, in whole or in part, for the purpose of

establishing debts owed, which impacts their credit.

349.    FCRA requires the adoption of reasonable procedures with regard to, inter alia, the

confidentiality and proper utilization of personal and insurance information. 15 U.S.C. § 1681(b).

350.    FCRA also requires that consumer reporting agencies "maintain reasonable

procedures designed to . . . limit the furnishing of consumer reports to the purposes listed under

section 1681b of this title." 15 U.S.C. § 1681e.

351.    Defendants failed to adopt and maintain these and other reasonable procedures designed to limit the furnishing of consumer reports to the purposes listed under 15 U.S.C. § 1681b.

352.    On information and belief, Defendants failed to take reasonable and appropriate measures to secure Plaintiffs' and Class Members' PII. Defendants also failed to place themselves in a position to immediately notify Plaintiff and Class Members about the Data Breach.

353.    Defendants' failure to protect and safeguard the PII of Plaintiffs and Class Members resulted in the disclosure of such information to one or more third-parties in violation of FCRA because such disclosure was not necessary to carry out the purpose for which Defendants received the information, nor was it permitted by statute, regulation, or order.

354.    Defendants' violations of FCRA, as set forth above, were willful or, at the very least, reckless, constituting willfulness.

355.    As a result of Defendants' willful or reckless failure to adopt and maintain reasonable procedures to limit the furnishing of Plaintiffs' and Class Members' PII to the purposes listed under 15 U.S.C. § 1681b, Plaintiffs' and the other Class Members' PII was disseminated to unauthorized third parties, compromised, and stolen. Plaintiffs suffered individual harm as a result of Defendants' willful or reckless violations of FCRA.

356.    As a further direct or proximate result of Defendants' willful or reckless violations of FCRA, as described above, Plaintiffs and Class Members were (and continue to be) injured and have suffered (and will continue to suffer) the damages described in detail in this Consolidated Class Action Complaint.

357.    Plaintiffs and Class Members, therefore, are entitled to compensation for their actual damages as described in detail in this Consolidated Class Action Complaint or statutory

damages of not less than $100, and not more than $1,000, each, as well as attorneys' fees, punitive damages, litigation expenses and costs, pursuant to 15 U.S.C.§ 1681n(a).

**COUNT V**
**NEGLIGENT VIOLATION OF THE FAIR CREDIT REPORTING ACT**
**(By all Plaintiffs[64] on behalf of the Nationwide Class (or, alternatively, each of the State Subclasses) against all Defendants)**

358.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

359.    Defendants negligently failed to adopt and maintain reasonable procedures designed to limit the furnishing of consumer reports to the purposes listed under 15 U.S.C. § 1681b.

360.    Plaintiffs' and Class Members' PII was wrongfully disseminated to the public as a direct and foreseeable result of Defendants' failure to adopt and maintain such reasonable procedures.

361.    Defendants disclosed Plaintiffs' and Class Members' PII to one or more third-parties in violation of FCRA because such disclosure was not necessary to carry out the purpose for which Defendants received the information, nor was it permitted by statute, regulation, or order.

362.    As a direct or proximate result of Defendants' negligent violations of FCRA, as described above, Plaintiffs' and Class Members' PII was made accessible to unauthorized third parties in the public domain, compromised, and stolen. Plaintiffs suffered individual harm as a result of Defendants' negligent violations of FCRA.

363.    As a further direct or proximate result of Defendants' negligent violations of FCRA, as described above, Plaintiffs and Class Members were (and continue to be) injured and have suffered (and will continue to suffer) the damages described in detail, *supra*.

---

[64] Plaintiffs Matts and Martin do not assert FCRA claims against Pathward.

364.    Plaintiffs and Class Members are therefore entitled to compensation for their actual damages, as well as attorneys' fees, litigation expenses, and costs, pursuant to 15 U.S.C. § 1681o.

**COUNT VI**
**BREACH OF IMPLIED CONTRACT**
**(By all Plaintiffs on behalf of the Nationwide Class**
**(or, alternatively, each of the State Subclasses) against NCB)**

365.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

366.    Plaintiffs and Class Members were required to provide NCB with their PII in exchange for use of the NCB's services.

367.    By Plaintiffs and Class Members providing their PII, and by NCB accepting this PII, the parties mutually assented to implied contracts. These implied contracts included an implicit agreement and understanding that: (1) NCB would adequately safeguard Plaintiffs' and Class Members' PII from foreseeable threats; (2) NCB would only disclose the PII to authorized individuals for business purposes; (3) NCB would delete the PII of Plaintiffs and Class Members once it no longer had a legitimate need; and (4) NCB would provide Plaintiffs and Class Members with notice within a reasonable amount of time after suffering a data breach.

368.    Plaintiffs and Class Members reasonably believed and expected that NCB's data security practices complied with relevant laws, regulations, and industry standards when they entered into the implied contracts with Defendants.

369.    NCB provided consideration by providing its services, while Plaintiffs and Class Members provided consideration by providing valuable property – their PII. NCB benefitted from the receipt of this PII by increasing profit from additional business.

370.    Plaintiffs and the Class Members fully performed their obligations under the implied contracts with NCB.

371.    Plaintiffs and Class Members would not have provided their PII to NCB in the absence of NCB's implied promise to keep their PII reasonably secure.

372.    NCB breached their implied contracts with Plaintiffs and Class Members by failing to implement reasonable data security measures.

373.    As a direct and proximate result of NCB's breaches of the implied contracts, Plaintiffs and Class Members sustained damages, as alleged above. Plaintiffs and Class Members are entitled to actual, compensatory, consequential, incidental, punitive, and nominal damages, in an amount to be proven at trial.

374.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Bank Defendants to, among other things: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for their lifetime.

**COUNT VII**
**BREACH OF IMPLIED CONTRACT**
**(By all Plaintiffs[65] on behalf of the Nationwide Class (or, alternatively, each of the State Subclasses) against Bank Defendants and John Doe 1-10 Defendants)**

375.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

376.    Plaintiffs and Class Members were required to provide the Bank Defendants with their PII in exchange for use of the Bank Defendants' services.

377.    By Plaintiffs and Class Members providing their PII, and by the Bank Defendants and John Doe 1-10 Defendants accepting this PII, the parties mutually assented to implied contracts. These implied contracts included an implicit agreement and understanding that: (1) Bank Defendants and John Doe 1-10 Defendants would adequately safeguard Plaintiffs' and Class

---

[65] Plaintiffs Matts and Martin do not assert breach of implied contract claims against Pathward.

Members' PII from foreseeable threats; (2) Bank Defendants and John Doe 1-10 Defendants would only disclose the PII to authorized individuals for business purposes; (3) Bank Defendants and John Doe 1-10 Defendants would delete the PII of Plaintiffs and Class Members once it no longer had a legitimate need; and (4) Bank Defendants and John Doe 1-10 Defendants would provide Plaintiffs and Class Members with notice within a reasonable amount of time after suffering a data breach.

378.    Plaintiffs and Class Members reasonably believed and expected that Bank Defendants' and John Doe 1-10 Defendants' data security practices complied with relevant laws, regulations, and industry standards when they entered into the implied contracts with Bank Defendants and John Doe 1-10 Defendants.

379.    Bank Defendants and John Doe 1-10 Defendants provided consideration by providing its services, while Plaintiffs and Class Members provided consideration by providing valuable property – their PII. Bank Defendants and John Doe 1-10 Defendants benefitted from the receipt of this PII by increasing profit from additional business.

380.    Plaintiffs and the Class Members fully performed their obligations under the implied contracts with the Bank Defendants and John Doe 1-10 Defendants.

381.    Plaintiffs and Class Members would not have provided their PII to the Bank Defendants and John Doe 1-10 Defendants in the absence of Bank Defendants' and John Doe 1-10 Defendants' implied promise to keep their PII reasonably secure.

382.    The Bank Defendants and John Doe 1-10 Defendants breached their implied contracts with Plaintiffs and Class Members by failing to implement reasonable data security measures.

383.    As a direct and proximate result of the Bank Defendants' and John Doe 1-10 Defendants' breaches of the implied contracts, Plaintiffs and Class Members sustained damages, as alleged above. Plaintiffs and Class Members are entitled to actual, compensatory, consequential, incidental, punitive, and nominal damages, in an amount to be proven at trial.

384.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Bank Defendants to, among other things: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for their lifetime.

**COUNT VIII**
**INVASION OF PRIVACY**
**Unreasonable Intrusion Upon Seclusion of Another/Unreasonable Publicity Given to Another's Private Life**
**(By all Plaintiffs[66] on behalf of the Nationwide Class (or, alternatively, each of the State Subclasses) against all Defendants))**

385.    Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth herein.

386.    Plaintiffs and Class Members had a legitimate expectation of privacy regarding their PII and were, accordingly, entitled to the protection of this information against disclosure to unauthorized third parties.

387.    Defendants owed a duty to Plaintiffs and Class Members to keep their PII confidential.

388.    The unauthorized disclosure and/or acquisition (i.e., theft) by a third party of Plaintiffs' and Class Members' PII is highly offensive to a reasonable person.

389.    Defendants' reckless and negligent failure to protect Plaintiffs' and Class Members' PII constituted a reckless and/or intentional intrusion into Plaintiffs' and the Class

---

[66] Plaintiffs Matts and Martin do not assert invasion of privacy claims against Pathward.

Members' interests in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that is highly offensive to a reasonable person.

390.    Defendants' failure to protect Plaintiffs' and Class Members' PII acted with a knowing state of mind when they permitted the Data Breach because they knew their information security practices were inadequate.

391.    Defendants knowingly did not notify Plaintiffs and Class Members in a timely fashion about the Data Breach.

392.    Because Defendants failed to properly safeguard Plaintiffs' and Class Members' PII, Defendants knew their inadequate cybersecurity practices would or would likely cause injury to Plaintiffs and the Class.

393.    As a proximate result of Defendants' acts and omissions, the private and sensitive PII of Plaintiffs and Class Members was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

394.    Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII is still maintained by Defendants using inadequate cybersecurity system and policies.

395.    Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the PII of Plaintiffs and the Class.

396.    Plaintiffs, on behalf of themselves and Class Members, seek injunctive relief to enjoin Defendants from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' PII.

397.    Plaintiffs, on behalf of themselves and Class Members, seek compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, the costs of future monitoring of their credit histories for identity theft and fraud, plus prejudgment interest and costs.

**COUNT IX**
**UNJUST ENRICHMENT**
**(By all Plaintiffs[67] on behalf of the Nationwide Class**
**(or, alternatively, each of the State Subclasses) against all Defendants)**

398.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein. This claim is pled in the alternative to the contract-based claims.

399.    Plaintiffs and Class Members conferred a monetary benefit on Defendants by providing Defendants with their valuable PII.

400.    Defendants appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members. Defendants also benefited from the receipt of Plaintiffs' and Class Members' sensitive PII, as this was utilized by Defendants as part of the account services it provided to companies. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII.

401.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and

---

[67] Plaintiffs Matts and Martin do not assert unjust enrichment claims against Pathward.

Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

402.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary value of the benefit belonging to Plaintiffs and Class Members because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

403.    Defendants acquired the monetary benefit and PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

404.    If Plaintiffs and Class Members knew that Defendants had not secured their PII, they would not have agreed to provide their PII to Defendant.

405.    Plaintiffs and Class Members have no adequate remedy at law.

406.    As a direct and proximate result of Defendants' breaches of the implied contracts, Plaintiffs and Class Members sustained damages as alleged above.

407.    In equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Class Members because Defendants failed to oversee, implement, or adequately implement, the data privacy and security practices and procedures that Plaintiffs and Class Members paid for and were otherwise mandated by federal, state, and local laws and industry standards.

408.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT X**
**CALIFORNIA CUSTOMER RECORDS ACT**
**Cal. Civ. Code §§ 1798.80, *et seq.***
**(By Plaintiffs Mardikian, Suh, Medina, Lozada, Del Hierro, Ross, O'Brien, Matts, and Martin and the California Subclass against all Defendants[68])**

409.     Plaintiffs Mardikian, Suh, Medina, Lozada, Del Hierro, Ross, O'Brien, Matts, and Martin (the "California Plaintiffs" for purposes of this count), on behalf of the the California Subclass, re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

410.     "[T]o ensure that personal information about California residents is protected," the California legislature enacted Cal. Civ. Code § 1798.81.5, which requires that any business that "owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the PII from unauthorized access, destruction, use, modification, or disclosure."

411.     Further, Cal. Civ. Code § 1798.82 requires businesses that own or license personal information to notify California residents when their personal information has been (or is reasonably believed to have been) acquired by unauthorized persons in a data security breach "in the most expedient time possible and without unreasonable delay." Among other requirements, the security breach notification must include "the types of personal information that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

412.     The California Plaintiffs are residents of California.

413.     Defendants are businesses that owns, maintains, and/or licenses personal information about California Plaintiffs and California Subclass Members, within the meaning of Cal. Civ. Code § 1798.81.5 and Cal. Civ. Code § 1798.82.

---

[68] Plaintiffs Matts and Martin do not assert CCRA claims against Pathward.

414. Defendants "own" or "license" this personal information because Defendants retain this information as part of their internal records relating to Plaintiffs and Class members or otherwise use this information as part of their transactions with Plaintiffs. See Cal. Civ. Code § 1798.81.5(a)(2). At a minimum, Defendants "maintain" this information because it was stored on Defendants' systems.

415. The computerized data Defendants owned, maintained, and/or licensed was "personal information" under Cal. Civ. Code § 1798.81.5 because it included, among other things, Social Security numbers.

416. Defendants violated Cal. Civ. Code § 1798.81.5 because they did not implement and maintain reasonable security procedures and practices appropriate to the nature of computerized data (e.g., Social Security Numbers) that Defendants owned, maintained, and/or licensed and did not take steps to protect this information from unauthorized access, use, or disclosure.

417. Further, because Defendants knew and/or reasonably believed that California Plaintiffs' and California Subclass Members' personal information was acquired by unauthorized persons during the Data Breach, Defendants had an obligation to disclose the Data Breach in a timely and accurate fashion, as mandated by Cal. Civ. Code § 1798.82.

418. Defendants failed to fully disclose material information about the Data Breach, including the types of PII impacted, in a timely fashion.

419. By failing to disclose the Data Breach in a timely and accurate manner, Defendants violated Cal. Civ. Code § 1798.82.

420.    As a direct and proximate result of Defendants' violations of the Cal. Civ. Code §§ 1798.81.5 and 1798.82, California Plaintiffs and California Subclass Members suffered damages, as described above.

421.    California Plaintiffs and California Subclass Members seek relief under Cal. Civ. Code § 1798.84, including actual damages and injunctive relief.

**COUNT XI**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(By Plaintiffs Mardikian, Suh, Medina, Lozada Del Hierro, Ross, O'Brien, Matts, and Martin and the California Subclass against all Defendants[69])**

422.    Plaintiffs Mardikian, Suh, Medina, Lozada, Del Hierro, Ross, O'Brien, Matts, and Martin (the "California Plaintiffs" for purposes of this count), on behalf of the California Subclass, re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

423.    The California Plaintiffs are residents of California.

424.    Defendants are each a "person" as defined by Cal. Bus. & Prof. Code §17201.

425.    The Defendants violated Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

426.    Defendants engaged in fraudulent practices by:

    a.    Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of California Plaintiffs and California Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45; California's Customer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*, and 1798.81.5; and

---

[69] Plaintiffs Matts and Martin do not assert UCL claims against Pathward.

b. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure California Plaintiffs' and California Subclass Members' PII including by implementing and maintaining reasonable security measures.

427.    These omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII. California Plaintiffs would have discontinued Defendants' access to their PII had this information been disclosed.

428.    Defendants' "unfair" acts and practices include:

a. Defendants failed to implement and maintain reasonable security measures to protect California Plaintiffs' and California Subclass Members' PII from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach;

b. Defendants failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security following previous cybersecurity incidents, as described herein. This conduct, with little if any utility, is unfair when weighed against the harm to California Plaintiffs and California Subclass Members, whose PII has been compromised;

c. Defendants' failure to implement and maintain reasonable security measures also was contrary to legislatively-declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTC Act,

15 U.S.C. § 45; and California's Customer Records Act, Cal. Civ. Code § 1798.81.5;

d. Defendants' failure to implement and maintain reasonable security measures also resulted in substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not know of Defendants' grossly inadequate security, consumers could not have reasonably avoided the harms that Defendants caused; and

e. Defendants' conduct violated California's public policy of protecting consumer data.

429.    Defendants have engaged in "unlawful" business practices by violating multiple laws, including California's Customer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification); the FTC Act, 15 U.S.C. § 45; and the common law.

430.    As a direct and proximate result of Defendants' unfair, unlawful, and fraudulent acts and practices, California Plaintiffs  and California Subclass Members were injured and suffered monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft, time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft; loss of value of their PII, loss of the value of access to their PII, and the value of identity protection services made necessary by the Breach.

431.    Defendants acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law and recklessly disregarded California Plaintiffs' and California Subclass

Members' rights. Upon information and belief, Defendants' numerous past data breaches put it on notice that its security and privacy protections were inadequate.

432.    The California Plaintiffs and California Subclass Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices or use of their PII, declaratory relief, reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5, injunctive relief, and other appropriate equitable relief.

**COUNT XII**
**VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
**Cal. Civ. Code §§ 1750, *et seq.***
**(By Plaintiffs Mardikian, Suh, Medina, Lozada, Del Hierro, Ross, O'Brien, Matts, and**
**Martin and the California Subclass against all Defendants[70])**

433.    Plaintiffs Mardikian, Suh, Medina, Lozada, Del Hierro, Ross, O'Brien, Matts, and Martin  (the "California Plaintiffs" for purposes of this count), on behalf of the California Subclass, re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

434.    The California Plaintiffs are residents of California.

435.    The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA") is a comprehensive statutory scheme that is to be liberally construed to protect consumers against unfair and deceptive business practices in connection with the conduct of businesses providing goods, property, or services to consumers primarily for personal, family, or household use.

436.    Defendants are each a "person" as defined by Civil Code §§ 1761(c) and 1770, and have provided "services" as defined by Cal. Civil Code §§ 1761(b) and 1770.

---

[70] Plaintiffs Matts and Martin do not assert CLRA claims against Pathward.

437.    The California Plaintiffs and the California Subclass are "consumers" as defined by Civil Code §§ 1761(d) and 1770 and have engaged in a "transaction" as defined by Civil Code §§ 1761(e) and 1770.

438.    Defendants' acts and practices were intended to and did result in the sales of products and services to California Plaintiffs and California Subclass Members in violation of Civil Code § 1770, *et seq.*, including:

> a.    Representing that goods or services have characteristics that they do not have;
>
> b.    Representing that goods or services are of a particular standard, quality, or grade when they were not;
>
> c.    Advertising goods or services with intent not to sell them as advertised; and
>
> d.    Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

439.    Given Defendants' omissions of the actual state of their data security practices, California Plaintiffs and California Subclass Members reasonably believed they had sufficient data security, which was false.

440.    Defendants' omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

441.    Defendants were trusted with sensitive and valuable PII regarding millions of consumers, including California Plaintiffs and California Subclass Members. Defendants accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly, California Plaintiffs and California Subclass Members acted reasonably in relying on Defendants' omissions, the truth of which they could not have discovered.

442.    As a direct and proximate result of Defendants' violations of California Civil Code § 1770, California Plaintiffs  and California Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Defendants' services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Breach.

443.    California Plaintiffs and California Subclass Members intend to seek all monetary and non-monetary relief allowed by law, including compensatory and punitive damages, an order enjoining the acts and practices described above, attorneys' fees, and costs under the CLRA.

444.    California Plaintiffs Mardikian, Suh, Medina, Lozada, Del Hierro, Ross, O'Brien, Matts, and Martin have sent the appropriate CLRA notice letters to NCB providing the notice required by Cal. Civ. Code § 1782(a) and assert claims for damages against NCB. In addition to sending notice to NCB, Plaintiff Medina also sent CLRA notice to BOA. NCB and BOA did not cure the violations of the CLRA alleged herein. California Plaintiffs Mardikian, Suh, Medina, Lozada, Del Hierro, Ross, and O'Brien seek injunctive relief as to Defendants BOA, Pathward, and John Does 1-10. Those California Plaintiffs who previously did not send notice to NCB, BOA, and Pathward will be sending notice in compliance with Cal. Civ. Code § 1782(a) and will be amending their complaint to seek damages.

<u>**COUNT XIII**</u>
**VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT ("CCPA")**
**Cal. Civ. Code §§ 1798.150,** *et seq.*
**(By Plaintiffs Mardikian, Suh, Medina, Lozada, Del Hierro, Ross, O'Brien, Matts, and**
**Martin and the California Subclass against all Defendants[71])**

445.    Plaintiffs Mardikian, Suh, Medina, Lozada, Del Hierro, Ross, O'Brien, Matts, and Martin (the "California Plaintiffs" for purposes of this count), on behalf of the California Subclass, re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

446.    The CCPA creates a private right of action for any consumer whose nonencrypted and nonredacted personal information is disclosed as a result of a business's violation of the duty to implement and maintain reasonable security procedures and practices.

447.    California Plaintiffs are residents of California.

448.    Defendants are each a "business" under Cal. Civ. Code § 1798.140(d).

449.    Defendants collect consumers' personal information ("PII" for purposes of this Count) as defined in Cal. Civ. Code § 1798.140 and was therefore obligated to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure.

450.    Defendants violated § 1798.150 of the CCPA by failing to protect California Plaintiffs' and California Subclass Members' nonencrypted PII from unauthorized access and exfiltration, theft, or disclosure as a result of Defendants' violations of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information.

---

[71] Plaintiffs Matts and Martin do not assert CCPA claims against Pathward.

451.    Defendants had a duty to implement and maintain reasonable security procedures and practices to protect California Plaintiffs' and California Subclass Members' PII. As detailed herein, Defendants failed to do so.

452.    As a direct and proximate result of Defendants' acts, the PII of California Plaintiffs and California Subclass Members was subjected to unauthorized access and exfiltration, theft, or disclosure.

453.    California Plaintiffs and California Subclass Members seek injunctive or other equitable relief to ensure Defendants hereinafter adequately safeguards customers' PII by implementing reasonable security procedures and practices. Such relief is particularly important because Defendants continue to hold customers' PII, including California Plaintiffs' and California Subclass Members' PII. California Plaintiffs and California Subclass Members have an interest in ensuring that their PII is reasonably protected.

454.    As described herein, an actual controversy has arisen and now exists as to whether Defendants implemented and maintained reasonable security procedures and practices appropriate to the nature of the information to protect the PII under the CCPA.

455.    A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendants and third parties with similar inadequate security measures.

456.    California Plaintiffs and California Subclass Members intend to seek statutory damages of between $100 and $750 per customer per violation or actual damages, whichever is greater, as well as all monetary and non-monetary relief allowed by law, including actual financial losses; injunctive relief; and reasonable attorneys' fees and costs.

457.    California Plaintiffs Mardikian, Suh, Medina, Lozada, Del Hierro, Ross, O'Brien, Matts, and Martin have sent the appropriate CCPA notice letters to NCB providing the notice required by Cal. Civ. Code § 1798.150(b) and assert claims for damages against NCB. In addition to sending notice to NCB, Plaintiff Medina also sent CCPA notice to BOA. NCB and BOA did not cure the violations of the CCPA alleged herein. California Plaintiffs Mardikian, Suh, Medina, Lozada, Del Hierro, Ross, and O'Brien seek injunctive relief as to Defendants BOA, Pathward, and John Does 1-10. Those California Plaintiffs who previously did not send notice to NCB, BOA, and Pathward will be sending notice in compliance with Cal. Civ. Code § 1798.150(b) and will be amending their complaint to seek damages.

### COUNT XIV
### VIOLATION OF THE DPPA
### 18 U.S.C. §§ 2721, *et seq.*
### (By all Plaintiffs on behalf of the Nationwide Class against NCB)

458.    Plaintiffs re-allege and incorporates by reference all preceding allegations as if fully set forth herein.

459.    Pursuant to 18 U.S.C. § 2722(a), "[i]t shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title."

460.    Pursuant to 18 U.S.C. § 2721(a)(1), "[a] [s]tate department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity: personal information, as defined in 18 U.S.C. 2725(3), about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section."

461.    The DPPA provides a civil cause of action against "a person who knowingly obtains, discloses, or uses personal information, from a motor vehicle record for a purpose not permitted" under the statute. 18 U.S.C. § 2724(a).

462.    "Person" is defined as "an individual, organization or entity." 18 U.S.C. § 2725(2). NCB is a "person" under the DPPA.

463.    "Personal information" is defined as "information that identifies an individual, including an individual's . . . driver identification number. . ." 18 U.S.C. § 2725(3). Plaintiffs' and Class Members' PII, which includes driver's license numbers, is "personal information" under the DPPA.

464.    "Motor vehicle record" is defined as "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. § 2725(1). NCB obtains motor vehicle records containing Plaintiffs' and Class Members' PII, including their driver's license numbers.

465.    NCB obtains motor vehicle records as part of its business operations.

466.    NCB's disclosure of Plaintiffs' and Class Members' personal information to unauthorized individuals violated 18 U.S.C. §§ 2722(a) and/or 2721(a)(1).

467.    NCB's disclosure of personal information was not a permitted use under 18 U.S.C. § 2721(b).

468.    NCB knowingly obtained and/or disclosed Plaintiffs' and Class Member's personal information, which came from a motor vehicle record, for a purpose not permitted under the DPPA.

469.    NCB knowingly and voluntarily configured and designed its servers and systems to disclose Plaintiffs' and Class Members' PII to cyber criminals in direct violation of the DPPA.

470. NCB installed no protections or security measures to protect this exposed information and willfully disclosed it to cyber criminals through the intentional configuration and design of its servers and systems.

471. Alternatively, NCB had constructive notice that it had disclosed the PII of Plaintiffs and Class Members to unauthorized third parties because it should have been aware that configuring and designing its servers and systems to disclose Plaintiffs' and Class Members' PII to unauthorized parties or other security protections would cause the disclosure of this information.

472. At the very least, NCB was willfully ignorant that its servers and systems were configured and designed without any protections to store Plaintiffs' and Class Members' PII and would disclose that personal information to cyber criminals.

473. Merriam-Webster's dictionary defines "disclose" as "to make known or public," "to expose to view," or, alternatively, "to open up." None of these definitions requires an identified intended recipient. Instead, disclosure is the act of exposure. Whether or not NCB meant for identifiable third parties to access the information is not relevant. All that is required for a knowing disclosure is a voluntary action.

474. Pursuant to 18 U.S.C. § 2724(b)(1)-(4), Plaintiffs seeks on behalf of themselves and members of the Class: (1) actual damages, not less than statutory liquidated damages in the amount of $2,500; (2) punitive damages; (3) reasonable attorneys' fees and costs; and (4) preliminary and equitable relief as the Court determines to be appropriate.

**COUNT XV**
**NEW YORK GENERAL BUSINESS LAW**
**N.Y. Gen. Bus. Law §§ 349, *et seq.***
**(By Plaintiff Meyer and the New York Subclass against NCB and BOA)**

475. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

476.     Defendants NCB and BOA engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, by:

   a.   Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Meyer's and New York Subclass Members' PII; and

   b.   Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff Meyer's and New York Subclass Members' PII including by implementing and maintaining reasonable security measures.

477.     These omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants NCB's and BOA's data security and ability to protect the confidentiality of consumers' PII. Plaintiff Meyer's and New York Subclass Members' would have discontinued Defendants NCB's and BOA's access to their PII had this information been disclosed.

478.     Defendants NCB and BOA acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiff Meyer's and New York Subclass Members' rights.

479.     As a direct and proximate result of Defendants NCB's and BOA's deceptive and unlawful acts and practices, Plaintiff Canales, Plaintiff Vetter and the New York Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an

increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Defendants' services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Data Breach.

480.    Defendants NCB's and BOA's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including the many New Yorkers affected by the Data Breach.

481.    The above deceptive and unlawful practices and acts by Defendants NCB and BOA caused substantial injury to Plaintiff Meyer and the New York Subclass that they could not reasonably avoid.

482.    Plaintiff Meyer and the New York Subclass seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

<u>COUNT XVI</u>
**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**Fla. Stat. §§ 501.201,** *et seq.*
**(By Plaintiff Lindquist and the Florida Subclass against NCB and BOA)**

483.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

484.    Plaintiff Lindquist and Florida Subclass Members are "consumers" as defined by Fla. Stat. § 501.203.

485.    Defendants NCB and BOA advertised, offered, or sold goods or services in Florida and engaged in trade or commerce directly or indirectly affecting the people of Florida.

486.    Defendants NCB and BOA engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce, in violation of Fla. Stat. § 501.204(1), including:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Lindquist's and Florida Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Lindquist's and Florida Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Florida's data security statute, F.S.A. § 501.171(2), which was a direct and proximate cause of the Data Breach;

d. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Lindquist's and Florida Subclass Members' PII,; and

e. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff Lindquist's and Florida Subclass Members' PII including by implementing and maintaining reasonable security measures.

487. These omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants NCB's and BOA's data security and ability to protect the confidentiality of consumers' PII. Plaintiff Lindquist and Florida Subclass Members would

have discontinued Defendants NCB's and BOA's access to their PII had this information been discontinued.

488.    As a direct and proximate result of Defendants NCB's and BOA's unconscionable, unfair, and deceptive acts and practices, Plaintiff Lindquist and Florida Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Defendants NCB's and BOA's services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Breach.

489.    Plaintiff Lindquist and Florida Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages under Fla. Stat. § 501.211; declaratory and injunctive relief; reasonable attorneys' fees and costs, under Fla. Stat. § 501.2105(1); and any other relief that is just and proper.

## COUNT XVII
### MASSACHUSETTS CONSUMER PROTECTION ACT
### Mass. Gen. Laws Ann. Ch. 93A, §§ 1, *et seq.*
### (By Plaintiffs Bliss and Teixeira and the Massachusetts Subclass against NCB and BOA)

490.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

491.    Defendants, Plaintiffs Bliss and Teixeira, and Massachusetts Subclass Members are "persons" as meant by Mass. Gen. Laws. Ann. Ch. 93A, § 1(a).

492.    Defendants NCB and BOA operates in "trade or commerce" as meant by Mass. Gen. Laws Ann. Ch. 93A, § 1(b).

493.    Defendants NCB and BOA advertised, offered, or sold goods or services in Massachusetts and engaged in trade or commerce directly or indirectly affecting the people of Massachusetts, as defined by Mass. Gen. Laws Ann. Ch. 93A, § 1(b).

494.    Defendants NCB and BOA engaged in unfair methods of competition and unfair and deceptive acts and practices in the conduct of trade or commerce, in violation of Mass. Gen. Laws Ann. Ch. 93A, § 2(a), including:

    a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs Bliss's and Teixeira's and Massachusetts Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

    b.  Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs Bliss's and Teixeira's and Massachusetts Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and the Massachusetts Data Security statute and its implementing regulations, Mass. Gen. Laws Ann. Ch. 93H, § 2; 201 Mass. Code Regs. 17.01-05, which was a direct and proximate cause of the Data Breach;

    d.  Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs Bliss's and Teixeira's and Massachusetts Subclass Members' PII, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs Bliss's and Teixeira's and Massachusetts Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and the Massachusetts Data Security statute and its implementing regulations, Mass. Gen. Laws Ann. Ch. 93H, § 2; 201 Mass. Code Regs. 17.01-05;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs Bliss's and Teixeira's and Massachusetts Subclass Members' PII; and

g.  Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs Bliss's and Teixeira's and Massachusetts Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and the Massachusetts Data Security statute and its implementing regulations, Mass. Gen. Laws Ann. Ch. 93H, § 2; 201 Mass. Code Regs. 17.01-05.

495.    Defendants NCB's and BOA's acts and practices were "unfair" because they fall within the penumbra of common law, statutory, and established concepts of unfairness, given that Defendants solely held the true facts about its inadequate security for PII, which Plaintiffs Bliss's and Teixeira's and the Massachusetts Subclass could not independently discover.

496.    Consumers could not have reasonably avoided injury because Defendants NCB's and BOA's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers about the inadequacy of its data security, Defendants NCB and BOA created an

asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

497.    Defendants NCB's and BOA's inadequate data security had no countervailing benefit to consumers or to competition.

498.    Defendants NCB and BOA intended to mislead Plaintiffs Bliss and Teixeira and the Massachusetts Subclass and induce them to rely on its misrepresentations and omissions. Defendants NCB's and BOA's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants NCB's and BOA's data security and ability to protect the confidentiality of consumers' PII.

499.    Defendants NCB and BOA acted intentionally, knowingly, and maliciously to violate Massachusetts's Consumer Protection Act, and recklessly disregarded Plaintiffs Bliss' and Teixeira's and Massachusetts Subclass Members' rights.

500.    As a direct and proximate result of Defendants NCB's and BOA's unfair and deceptive conduct, Plaintiffs Bliss and Teixeira and the Massachusetts Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Defendants' services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Data Breach.

501.    Plaintiffs Bliss and Teixeira and the Massachusetts Subclass seek all monetary and non-monetary relief allowed by law, including actual damages, double or treble damages, injunctive or other equitable relief, and attorneys' fees and costs.

**COUNT XVIII**
**DECLARATORY AND INJUNCTIVE RELIEF**
**(By all Plaintiffs[72] on behalf of the Nationwide Class against all Defendants)**

502.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

503.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the statutes described in this Complaint.

504.    An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and statutory duties to reasonably safeguard its customers' sensitive personal information and whether Defendants are currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches. Plaintiffs alleges that Defendants' data security practices remain inadequate.

505.    Plaintiffs and Class Members continue to suffer injury as a result of the compromise of their sensitive personal information and remain at imminent risk that further compromises of their personal information will occur in the future.

506.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Defendants continue to owe a legal duty to secure consumers' sensitive personal information, to timely notify consumers of any data breach, and to establish and implement data security measures that are adequate to secure customers' sensitive personal information.

---

[72] Plaintiffs Matts and Martin do not assert declaratory and injunctive relief claims against Pathward.

507.    The Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect consumers' sensitive personal information.

508.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, for which they lack an adequate legal remedy. The threat of another data breach is real, immediate, and substantial. If another data breach at NCB occurs, Plaintiffs and Class Members will not have an adequate remedy at law because not all of the resulting injuries are readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

509.    The hardship to Plaintiffs and Class Members if an injunction does not issue greatly exceeds the hardship to Defendants if an injunction is issued. If another data breach occurs, Plaintiffs and Class Members will likely be subjected to substantial risk of identity theft and other damages. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants has a pre-existing legal obligation to employ such measures.

510.    Issuance of the requested injunction will serve the public interest by preventing another data breach at NCB, thus eliminating the additional injuries that would result to Plaintiffs and the hundreds of thousands of consumers whose confidential information would be further compromised.

## COUNT XIX
## BREACH OF CONTRACTS TO WHICH PLAINTIFFS AND CLASS MEMBERS WERE INTENDED THIRD PARTY BENEFICIARIES
### (On behalf of Plaintiffs and the Nationwide Class (or, alternatively, each of the State Subclasses) against all Defendants[73])

511.   Plaintiffs restate and reallege the preceding allegations above as if fully alleged herein.

512.   This claim is pled in the alternative to the breach of implied contract claim and all the other claims herein.

513.    Plaintiffs bring this claim individually and on behalf of the Class.

514.   NCB had valid contracts with each of the Bank Defendants and John Doe 1-10 Defendants. The principal purpose of those contracts was to securely store, transmit and safeguard the Private Information of Plaintiffs and class members from the Bank Defendants to NCB.

515.   If Plaintiffs and Class Members knew that the Bank Defendants and John Doe 1-10 Defendants had retained a vendor that would not reasonably secure their Private Information, they would not have agreed to provide their Private Information to the Bank Defendants in the first instance.

516.   As a direct and proximate result of the conduct of both NCB and the Bank Defendants and John Doe 1-10 Defendants, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

517.   NCB and the Bank Defendants and John Doe 1-10 Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that it unjustly received from them. In the alternative, NCB should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for NCB's services.

---

[73] Plaintiffs Matts and Martin do not assert breach of contracts to which Plaintiffs and Class Members were intended third party beneficiaries against Pathward.

## REQUEST FOR RELIEF

Plaintiffs, on behalf of all others similarly situated, requests that the Court enter judgment against Defendants including the following:

1.      Determining that this matter may proceed as a class action and certifying the Class asserted herein;

2.      Appointing Plaintiffs as representatives of the applicable Class and appointing Plaintiffs' counsel as Class Counsel;

3.      An award to Plaintiffs and the Class of actual, compensatory, consequential, incidental, punitive, nominal statutory, double, treble, and restitution damages, in an amount to be proven at trial as set forth above;

4.      Ordering injunctive relief requiring Defendants to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; (iii) provide lifetime credit monitoring and identity theft insurance to all Class Members; (iv) timely notify consumers of any future data breaches; and (v) delete or destroy any legacy consumer data that it is not necessary to keep for business purposes;

5.      Entering a declaratory judgment stating that Defendants owe a legal duty to secure customers' sensitive personal information, to timely notify consumers of any data breach, and to establish and implement data security measures that are adequate to secure sensitive personal information;

6.      An award of attorneys' fees, costs, and expenses, as provided by law or equity;

7.      An award of pre-judgment and post-judgment interest, as provided by law or equity; and

8.      Such other relief as the Court may allow.

## DEMAND FOR JURY TRIAL

Plaintiffs demands a trial by jury for all issues so triable.

Respectfully submitted,

DATED: July 20, 2023

*/s/ Benjamin F. Johns*
Benjamin F. Johns
PA ID# 201373
Samantha E. Holbrook
PA ID# 311829
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Telephone: (610) 477-8380
Email: bjohns@shublawyers.com
Email: sholbrook@shublawyers.com

Joseph M. Lyon (admitted *pro hac vice*)
**THE LYON LAW FIRM, LLC**
2754 Erie Avenue
Cincinnati, OH 45208
Telephone: (513) 381-2333
Email: jlyon@thelyonfirm.com

Christian Levis (admitted *pro hac vice*)
Amanda G. Fiorilla (admitted *pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Email: clevis@lowey.com
Email: afiorilla@lowey.com

Anthony M. Christina
PA ID# 322528
**LOWEY DANNENBERG, P.C.**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone: (215) 399-4770
Email: achristina@lowey.com

*Interim Co-Lead Class Counsel*

110

Charles E. Schaffer
PA ID# 76259
**LEVIN SEDRAN & BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
Email: cschaffer@lfsblaw.com

*Plaintiffs' Liaison Counsel*

Terence R. Coates (*pro hac vice* forthcoming)
**MARKOVITS, STOCK & DEMARCO, LLC**
119 E. Court Street, Suite 530
Cincinnati, OH 45202
Telephone: 855-843-5442
Email: TCoates@msdlegal.com

Joseph B. Kenney
PA ID# 316557
**SAUDER SCHELKOPF LLC**
1109 Lancaster Avenue
Berwyn, PA 19312
Telephone: (610) 200-0583
Email: jbk@sstriallawyers.com

Danielle L. Perry (*pro hac vice* forthcoming)
**MASON LLP**
5335 Wisconsin Avenue, N.W., Suite 640
Washington, D.C. 20015
Telephone: (202) 640-1168
Email: dperry@masonllp.com

*Plaintiffs' Steering Committee*

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2023, I electronically filed the foregoing Consolidated Class Action Complaint. Notice of this filing will be sent by electronic mail to all parties who filed a notice of appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

*/s/ Benjamin F. Johns*
Benjamin F. Johns